F. C. DEATON ET AL. v. J. M. RUSH ET AL.

No. 3585.  Decided June 30, 1923.

(252 S. W., 1025.)

1.—Vendor and Purchaser—Fraud—Rescission.

The right of a purchaser induced to buy land by fraudulent representations to rescind the contract is not lost by failure to take such action in due time on discovery of the falsity of a part only of the representations. (Here representations as to school facilities in Mexico where the land lay). He may still maintain timely action for rescission on subsequent discovery of falsity of other material representations furnishing independent ground therefor.  (Here discovery that the land itself was valueless).  (Pp. 186-191).

2.—Same—Action for Recovery of Land.

A vendor having the equitable right to rescind and cancel for fraud in obtaining it, a conveyance of title to another, cannot maintain suit for the recovery of the land from such vendee before the cancellation of the deed; though he may have judgment for such cancellation and, as an incident thereto, for the recovery of the land in the same suit. (Pp. 191-193).

3.—Same—Accrual of Cause of Action.

The cause of action for the recovery of land by a vendor who has conveyed title, but has an equitable right to have the conveyance cancelled for fraud, does not accrue until such cancellation has been effected by judgment. (Pp. 194-197).

4.—Same—Limitation.

Limitation against an action by the vendor to cancel a deed secured by fraud is governed by Rev. Stats., Article 5690 (four years from the accrual of the right). And by Rev. Stats., Art. 5708 this limitation does not run against a married woman. (P. 195).

5.—Same—Five Years Possession, Etc.

Neither the Statute of Limitation against actions for recovery of land, Rev. Stats., Art. 5674 (five years from the time cause of action accrued) nor Rev. Stats., Art. 5679 (giving title by such five years adverse possession, etc.) apply to the case of one having an equitable right to obtain cancellation of his conveyance obtained by fraud, nor to his right to have judgment for the land in such action and as an incident to the judgment of cancellation. Roseborough v. Cook, 108 Texas, 364, and Davis v. Howe, 213 S. W., 609, distinguished. (Pp. 195-197).

6.—Same—Innocent Purchaser—Oil and Gas—Equitable Right.

A lease conveying oil and gas in place, for a valuable consideration, with the right to enter and appropriate, is held to convey to the lessee and estate in the land itself, and not a mere option. The lessee will be protected as an innocent purchaser from the holder of the legal title, against equitable rights to the land (through fraud of his lessor in obtaining deed to it) of which he had no notice. (Pp. 197, 198).

7.—Same—Cases Discussed.

Gilmore v. O'Neil, 107 Texas, 18; Erwin v. Olsan, 241 S. W., 473, followed. National Oil & Pipe Line Co. v. Teel, 95 Texas, 586, discussed. (P. 197).

Questions certified from the Court of Civil Appeals for the Second District, in an appeal from Stephens County.

Deaton and wife sued Rush and the Magnolia Petroleum Co., and appealed from a judgment for defendants. The opinion of the Court of Civil Appeals affirmed the judgment in part and reversed and rendered in part. On motion for rehearing they certified to the Supreme Court the nine questions here considered. These were referred to the Commission of Appeals, Section B, for their opinion, and that being here adopted by the Supreme Court is certified as its answer to the questions.

*Grisham Bros.* and *Miller & Miller,* for appellants.

Since appellant's substantial and material right to rescind depends upon the falsity of the representations made by appellees concerning the character and quality of the Rio Cajones lands, and since undoubtedly and unquestionably she had not discovered such falsity before June, 1919, she cannot, upon reason and authority, be held bound by her election upon the discovery of the false representations concerning churches and schools. 2 Black, Rescission and Canc., Sec. 591, p. 1377; Ingram v. Abbott, 14 Texas Civ. App., 583, 38 S. W., 626; Pitcher v. Webber, 103 Me., 101; Pierce v. Wilson, 34 Ala., 596; Stelter v. Fowler, 62 Wash., 345.

It seems clear enough, since the case at bar is not one for the recovery of land, but one for rescission of a contract and cancellation of the deed obtained by fraud, that appellant is not barred of her right of rescission and cancellation by the statute of limitations of five years. McCampbell v. Durst, 15 Texas Civ. App., 522, 40 S. W., 319; Martin v. Burr, 111 Texas, 57.

The authorities most clearly fix the status of the deed from appellant and her husband dated September 26, 1910, herein attacked, as being not void, but only voidable. Benjamin on Sales, Secs. 428, 452; 2 Black, Resc. and Canc., Sec. 561; History Co. v. Flint, 15 S. W., 912; Murchison v. White, 54 Texas, 78; Morgan v. Morgan, 38 Pac., 1054.

Since the deed from appellant and her husband to appellees is voidable only, it can only be attacked in a direct proceeding, and its voidability can not be taken advantage of in an action of trespass to try title. McCampbell v. Durst, 15 Texas Civ. App., 522; Gulf Production Co. v. Palmer, 230 S. W., 1017.

Applied to a cause of action the term "to accrue" means to arrive; to commence; to come into existence; to become a present enforceable demand. 1 C. J., p. 733; Eising v. Andrews, 33 Atl., 585, 586-587; Weiser v. McDowell, 61 N. W., 1094; 25 Cyc., 1065; Amy v. Dubuque, 98 U. S., 470.

Tested by these definitions and decisions, it cannot be contended that Mrs. Deaton's cause of action accrued till the deed from her and her husband to Rush, obtained by Rush's fraud, was canceled, because, in order to maintain her cause of action for the recovery of the land, she would have to prove that she owned it, and was entitled to its possession. She could not do this with her voidable deed outstanding and uncanceled. Moore v. Snowball, 98 Texas, 16.

This case has never been overruled, but upon the contrary has been referred to with approval in numerous cases since, among which we cite,—Harrison v. First National Bank, 224 S. W., 269, 273, and Ward v. Scarborough, 223 S. W., 1107, 1113, both by the Court of Civil Appeals of the Second Supreme Judicial District of Texas; Alfalfa Lumber Co. v. Mudgett, 199 S. W., 337, 340; Ives v. Culton, 197 S. W., 619,

623-624; Vance v. Southern Kansas Ry. Co., 173 S. W., 265, and Ellerd v. Ellison, 165 S. W., 876, 882, all by the Court of Civil Appeals of the Seventh District; James v. James, 164 S. W., 47, 48; Drummond v. Lewis, 157 S. W., 268, and Moore v. Miller, 155 S. W., 573, 579, both by the Court of Civil Appeals of the Fourth District; Whitney v. Parish of Vernon, 154 S. W., 264, 266; Wylie v. Langhorne, 45 Texas Civ. App., 619, 620, both by the Court of Civil Appeals of the First District, and Manning v. Green, 56 Tex. Civ. App., 579, 586, by the Court of Civil Appeals of the Fifth District.

It is well settled that the statute of limitations for rescission because of fraud does not begin to run until the discovery of the fraud. Calhoun v. Burton, 64 Texas, 510; Munson v. Hallowell, 26 Texas, 475; Anding v. Perkins, 29 Texas, 348; Bremond v. McLean, 45 Texas, 10; Kuhlman v. Baker, 50 Texas, 630; Alston v. Richardson, 51 Texas, 6; Ripley v. Withee, 27 Texas, 14; Ransome v. Bearden, 50 Texas, 119; Connolly v. Hammond, 51 Texas, 635; Coleman v. Thurmond, 56 Texas, 514; Brown v. Brown, 61 Texas, 45; Cooper v. Lee, 21 S. W., 998.

The holder's possession can only be *adverse* to one who has a claim or the right of immediate possession, for the simple reason that trespass to try title is a possessory action. The right to it does not accrue to one who is not entitled to possession. Cook v. Caswell, 81 Texas, 678, 684; Govan v. Bynum, 43 S. W., 319; Morris v. Eddins, 44 S. W., 203; Simonton v. White, 49 S. W., 269; Gohnabel v. McNeill, 110 S. W., 558; Smith v. Power, 23 Texas, 30; R. B. Templeman & Son v. Kempner, 223 S. W., 293; Borer v. Chapman, 119 U. S., 601; Rutherford v. Carr, 99 Texas, 101.

The Teel case was referred to with approval by this court in the cases of Corsicana Petroleum Co. v. Owens, 110 Texas, 568, 572; Hennesy v. Blair, 107 Texas, 39; Texas Co. v. Daugherty, 107 Texas, 226; Grubb v. McAfee, 109 Texas, 527. Also in various Courts of Civil Appeals in the following cases, to-wit: Texas & Pacific Coal & Oil Co. v. Fox, 228 S. W., 1021; Texas Co. v. Curry, 229 S. W., 643, 645; Taylor v. Turner, 230 S. W., 1031, 1033; Witherspoon v. Staley, 156 S. W., 557, 558; Texas Produce Exchange v. Sorrell, 168 S. W., 74, 77; Owens v. Corsicana Petroleum Co., 169 S. W., 192, 194; Fisher v. Crescent Oil Co., 178 S. W., 905; Mutual Film Corp. v. Morris & Daniel, 184 S. W., 1060; Griffin v. Bell, 202 S. W., 1034; Aycock v. Reliance Oil Co., 210 S. W., 851; Nicholson v. Slaughter, 217 S. W., 717; Jackson v. Pure Oil Op. Co., 217 S. W., 960; Aurelius v. Stewart, 219 S. W., 865; Hitson v. Gilman, 220 S. W., 140; Nolan v. Young, 220 S. W., 154; Hunter v. Gulf Production Co., 220 S. W., 163, 165; McKay v. Tally, 220 S. W., 167; Young v. Jones, 222 S. W., 691, 693, 694; Burt v. Deorsam, 227 S. W., 354, 356-357; Varnes v. Dean, 228 S. W., 1017, 1018; Atlantic Oil Production Co. v. Dawkins, 230 S. W., 525, 527.

*Shepherd & Kelley, Veale, Caldwell & Evans,* and *Wagstaff & Wagstaff,* for appellees. ·

The evidence being undisputed that the defendant, Rush, has held the land in controversy, claiming same, under a deed duly registered for more than five years prior to the filing of this suit, cultivating, using and enjoying the same and paying taxes thereon, the court could not have rendered any other judgment than for the defendant Rush and the Court did not err in so rendering judgment. Rosborough v. Cook, 194 S. W., 131; Davis v. Howe, 213 S. W., 609; Seals v. Seals, 81 S. E., 613; McCann v. Welch, 81 N. W., 996.

Appellants having alleged in their petition that Rush had represented to them that there were good schools, churches and roads on the Rio Cajones estate in Mexico as an inducement to them to trade for the land in Mexico, and having gone to Mexico in the fall of 1910 and remained there some six months and having discovered that these representations were wholly false and untrue, and having the right then to rescind the trade made in September, 1910, and having failed to do so at said time, and having afterwards claimed the certificate for the land in Mexico and having sold the same, they thereby waived forever their right to rescind and the Court could have rendered no other judgment except a judgment for the defendants ·in this cause. Benjamin on Sales (1888 Ed.), sec. 452-453; Taylor v. Short, 17 S. W., 970; Greenwood v. Fenn, 26 N. E., 487; Richardson v. Lowe, 149 Fed., 625; Brown v. Gordon-Tiger Mining Co., 97 Pac., 1042; Minter v. Hawkins, 117 S. W., 172.

*W. H. Francis* and *A. S. Hardwicke,* for appellee, Magnolia Petroleum Co., filed brief in Supreme Court supporting its claim to be an innocent purchaser on the sixth question certified.

The word title as used in reference to bona fide purchasers has reference to the evidence of rights held by the vendor, which, by a conveyance, becomes the purchaser's evidence of right. If a vendor· has such written evidence of his title to the land to be sold as under the laws of this state confer on him an estate in fee, then it must be held that he has not only title, but also legal title. Such a title is a legal title because it is such evidence of right as may be enforced in a court of law, and this is true because it is the evidence of ownership required by law and provided for by statute where lands, are to be conveyed. Patty v. Middleton, 82 Texas, 586; Hennessy v. Blair, 107 Texas, 39.

It is now the settled law in this state that oil and gas are minerals, and in place, are a part of the realty; that the title to the surface may be conveyed to one person and the title to the strata beneath the surface containing the minerals to another. Texas Company v. Daugherty, 107 Texas, 226, 176 S. W., 717.

The language contained in the contract was a present grant of title, a legal title, in the minerals and lands therein described for the full space and term of ten (10) years from date thereof, and for such other and further period of time as any of said minerals shall be produced, constituting the entire grant as one capable of indefinite duration, subject to the contingency of being defeated according to the conditions subsequent named therein. Texas Company v. Daugherty, 107 Texas, 226, 176 S. W., 717; Hynson v. Gulf Co., 232 S. W., 873; Davis v. Texas Co., 232 S. W., 549; Smith v. Womack, 231 S. W., 840; Richmond v. Hog Creek Oil Co., 229 S. W., 563; McKay v. Lucas, 220 S. W., 172; Pierce-Fordyce Oil Association v. Woodrum, 188 S. W., 245; Hickernell v. Gregory, 224 S. W., 691; Thomason v. Upshur County, 211 S. W., 325; Key v. Big Sandy Oil & Gas Development Co., 212 S. W., 300; Jackson v. Pure Oil Operating Co., 217 S. W., 959; McEntire v. Thomason, 210 S. W., 563; Thomason v. Ham, 210 S. W., 561; Southern Oil Co. v. Colquitt, 69 S. W., 169; Priddy v. Green, 220 S. W., 243; Guffey v. Smith, 237 U. S., 101; Rich v. Donaghey, 177 Pac., 86, 3 A. L. R., 352, and extensive note thereunder.

The surrender clause in the grant did not limit the legal title conveyed to lessee, but, on the contrary, evidences the fact that the legal title is in the lessee, as its purpose is to permit the lessee to surrender and re-convey unto the lessor the legal title it acquired by virtue of the grant, and to release lessee from further obligations under the covenants entailed on lessee by reason of its ownership of the legal title. Guss v. Nelson, 200 U. S., 298; In Re Allen, 183 Fed., 172; James on Option Contracts, Sec. 507; (See, also, authorities under next point).

The surrender clause did not make the grant a mere option and thereby relieve lessee of the fulfillment of the covenants contained in the contract, as lessee is obligated to do one of three things. First, within one year begin the drilling of a well; or, second, pay lessors during the ten year term of the grant the sum of $156.62 on or before the beginning of each period of three months until a well shall be begun; or, third, surrender the grant as provided for in the surrender clause. Rich v. Donaghey, 177 Pac., 86, 3 A. L. R., 352; Guffey v. Smith, 237 U. S., 101; Corsicana Petroleum Co. v. Owens, 222 S. W., 154; Northwestern Oil & Gas Co. v. Branine, 175 Pac., 533, 3 A. L. R., 344; See extensive annotation under Rich v. Donaghey in 3 A. L. R., 378; annotation under Brown v. Wilson, 1917B, L. R. A., 1206.

Until the option to surrender is exercised the lessee is bound by its covenants contained in the grant, and a surrender will not affect any existing liability but will avoid future liability only. Corsicana Pet. Co. v. Owens, 222 S. W., 154; Guffey v. Smith, 237 U. S., 101; Rich v. Donaghey, 177 Pac., 86, 3 A. L. R., 352.

When an oil and gas lease is made for a valuable consideration and contains a provision that lessee shall have the right, at any time, to surrender the lease to lessor for cancellation, after which all payments and liabilities to accrue under and by virtue of its term shall cease and determine, the consideration or down payment is a sufficient consideration 'to' support the surrender clause. Pierce-Fordyce Oil Association v. Woodrum, 188 S. W., 245; McEntire v. Thomason, 210 S. W., 563; 9 Cyc., 334; Knott v. Thomas, 180 S. W., 1114; Hunter v. Gulf Production Co., 220 S. W., 163; Jackson v. Pure Oil Operating Co., 217 S. W., 959; McKay v. Talley, 220 S. W., 167; Northwestern Oil & Gas Co. v. Branine, 175 Pac., 533, 3 A. L. R., 344.

In any event Magnolia Petroleum Company has an equitable title or right in its grant, the minerals and possession of the land described in its contract, for the purposes named therein; and, under the doctrine of Adjustment of Equities it has protection as an innocent purchaser, as appellants claims to the property are likewise equitable. Luckel v. Phillips Pet. Co., 243 S. W., 1068; Johnson v. Newman, 43 Texas, 628; Luckel v. Phillips Pet. Co., 235 S. W., 605.

*R. E. Hardwicke*, as amicus curiae, by leave of the Court filed written argument in support of the positions of the Magnolia Petroleum Co.

MR. JUDGE HAMILTON delivered the opinion of the Commission of Appeals, Section B.

In this case, omitting immaterial portions of the certificate, questions are certified to the Supreme Court as follows:

"The above entitled cause is now pending in this court upon a motion for rehearing. The suit was instituted in the district court of Stephens County by the appellants, F. C. Deaton and wife, Annie Deaton, against J. M. Rush and the Magnolia Petroleum Company, claiming a mineral interest, to cancel a conveyance of two several tracts of land in Stephens County, aggregating 286 acres, alleged to have been conveyed to the appellee J. M. Rush in exchange for 313 acres of land in the western part of block No. 35 of the Rio Cajones lands in the State of Oaxaca, Republic of Mexico, on the ground that said exchange had been procured by means of false and fraudulent representations made by appellee Rush concerning the situation, character, quality and value of the Mexican lands.

"The defendant Rush, in addition to a general denial, pleaded the four and five years statutes of limitation, and also pleaded the five year statute of limitation as the basis of a cross-action against the plaintiffs to quiet his title.

"The Magnolia Petroleum Company, which was sued by its trustees named in the petition, adopted the answers of the defendant Rush, and, in addition thereto, pleaded that it was an innocent pur-

chaser for value of its mineral lease and sought a recovery on this ground.

"The case was submitted to a jury upon special issues, which were answered to the effect that defendant Rush in fact made the representations as alleged; that they were false and that the plaintiffs were thereby induced to exchange their lands in Stephens County for the land in Mexico, which proved to be worthless; but further found that 'plaintiff, F. C. Deaton', as early as 1911, knew or could have ascertained by the exercise of reasonable diligence that the Mexican land was worthless, and that both 'F. C. Deaton and his wife, Annie Deaton, were guilty of laches in failing to bring suit for rescission before May, 1919'.

"The evidence is undisputed that defendant Rush had held the Stephens County land under a deed from plaintiffs, which had been duly recorded, and had paid all taxes thereon, cultivating, using and enjoying the same for more than five years before the filing of this suit, but that issue was not submitted to the jury, nor was the issue presenting the plea of an innocent purchaser by the Magnolia Petroleum Company submitted.

"Upon the findings and evidence referred to, the trial court entered a judgment in behalf of appellees, J. M. Rush and the Magnolia Petroleum Company. The findings of the jury on the issue of fraud are not contested.

"On appeal, as will be seen from our opinion which will be transmitted herewith, we held, contrary to appellants' contention, that the evidence was sufficient to sustain the findings of the jury that F. C. Deaton knew or could have ascertained, by the exercise of reasonable diligence, the worthless character of the Mexican land as early as 1911, some seven or more years before the institution of this suit, and therefore affirmed the judgment below as against F. C. Deaton. It was undisputed, however, that of the lands secured by appellee Rush by means of the false and fraudulent representations alleged and found by the jury, one of the tracts, consisting of 160 acres, was owned in the separate right of Mrs. Annie Deaton, and that she, at the time of the conveyance of her said land to appellee, as at all times thereafter, was a married woman, and we held, for the reasons and upon the authorities shown in our said opinion, that the suit was not one for the recovery of real estate, but, on the contrary, was one for the rescission and cancellation of the deed made by Annie Deaton to appellee Rush, and that because of Annie Deaton's coverture she was not barred by limitation from her action to cancel and rescind. For the reasons and authorities upon which this holding was based, we respectfully refer you to our opinion on that subject. We accordingly reversed the judgment as against Annie Deaton and here rendered it in her favor, cancelling the deed made by her to appellee

Rush covering the land owned by her in her own separate right, in so far as it operated to divest her title, but refused to award to her a recovery of the land, as would under other circumstances be proper under the authority of McCampbell v. Durst, 15 Texas Civ. App., 522, 40 S. W., 315, and other cases on that subject cited in our opinion, and remanded the cause for a determination of the issues of damages, it being our opinion that her right to a recovery of the damages occasioned by appellee's fraud had not been destroyed. Our refusal to award to appellant, Annie Deaton, a recovery of the land was based upon appellee Rush's plea and proof of title under the five years statute of limitation. The basis of this ruling on our part is also shown in our said opinion, and which, therefore, need not be here repeated.

"Appellant Annie Deaton, in an elaborate motion for rehearing, insists, among other things, that we were in error in denying her a recovery of the land, the contention being, in substance, that a cancellation of her deed was a prerequisite to a recovery of any relief on her part, and that, therefore, as against her appellee's possession was not adverse and limitation in his favor did not begin until after the decree of cancellation. Appellee, on the other hand, contends that by virtue of the terms of our five years statute of limitation all claims of Annie Deaton of whatever character, including the claim of relief of a forced re-possession, was extinguished, and that hence no right of cancellation existed, relying for this contention particularly upon the case of McCann v. Welsh, by the Supreme Court of Wisconsin, 81 N. W., 996 (106 Wis., 142).

"As presenting one of appellee's defenses urgently insisted upon, we further state that among other inducements offered by appellee was the statement that there were good schools, churches and roads on the Rio Cajones estate in Mexico. The evidence shows that Annie Deaton and her husband moved to Mexico in the fall of 1910 and remained there some five or six months, and it was ascertained by both appellants that these representations were false, and appellee insists that by Annie Deaton's failure to promptly institute suit she thereby waived her action for cancellation, regardless of the falsity of appellee's further representations relating to the character of the Mexican lands. We were of the opinion that knowledge on the part of Annie Deaton of these representations did not bar her nor estop her from seasonably instituting her action upon discovery of the falsity of the representations relating to the land in Mexico. Our further conclusion in this connection is that the finding of the jury to the effect that Annie Deaton was guilty of laches is not supported by the evidence in so far as this question enters into her right to maintain her suit on the ground that the Mexican lands were worthless.

"Under the foregoing facts we deem it advisable to certify to your Honors for determination the following questions which are material in this cause, towit:

"1. Did Annie Deaton's discovery of the falsity of appellee's representations that there were good schools, churches and roads on the Rio Cajones estate in Mexico amount to a waiver of her right to institute this action upon her later discovery of the falsity of appellee's representations relating to the lands for which Annie Deaton exchanged her land in Stephens County?

"2. If question No. 1 be answered in the negative, then was or not the possession of the land in controversy by Rush adverse to Mrs. Deaton, before the cancellation as title of her deed conveying said land, which had been so obtained by the fraud of Rush? . . .

"3. Did or not Mrs. Deaton's cause of action for the recovery of her land accrue before the cancellation as title of her deed to Rush, procured by fraud of Rush, conveying said land? . . .

"4. Could Mrs. Deaton have maintained a suit for the recovery of the land, conveyance of which was obtained from her by Rush, by means of fraud, before the cancellation of such deed? . . .

"5. If Mrs. Deaton is entitled to a cancellation of her deed to Rush, obtained by fraud, as a conveyance of title, and to a rescission of the contract in which said land was obtained, is she barred of her right to recover the land by the facts that for more than five years before the cancellation of such deed Rush had been in possession of the land, using it and paying all taxes thereon, claiming under such deed which for such time had been properly recorded? In other words, what is the proper measure of her recovery? Should it be a restoration of the land or should she be limited to pecuniary damages? And if the latter, would her measure be the value of the land at the time of the trial or at the date of appellants' conveyance to appellee, or at the date of the institution of the suit?

"6. Should your Honors determine questions one to four, inclusive, in favor of Mrs. Deaton, and should further determine in answer to question five that she may be awarded a restoration of her land, it will then be necessary to determine the claim of the Magnolia Petroleum Company. It claims to be a purchaser in good faith and for a valuable consideration without notice of Annie Deaton's equity. In relation to this claim we further state that it was shown without dispute that the agent of the Petroleum Company secured from appellee Rush and his wife a mineral lease, paying therefor a valuable consideration and without notice of the equities set up by the appellants in this suit. The mineral lease under consideration is dated October 2, 1916, and recites that the grantors, Rush and wife, 'for and in consideration of $610.50 to us paid by the Magnolia Petroleum Company, receipt of which is hereby acknowledged, have granted, sold and con-

veyed unto' John Sealy and other named trustees of the Magnolia Petroleum Company 'all the oil, gas and other minerals in and under' the lands involved in this suit. The lease contained further stipulations to the effect that the grantee therein might enter, lay pipe lines, etc., with the usual habendum clauses, 'for the full space and term of ten years from date hereof, and for such other and further period of time as any of such minerals shall be produced on said land.' Following these provisions, the lease reads:

" 'The Magnolia Petroleum Company agrees that it will, within one (1) year from the date hereof begin the drilling of a well on said land, or failing to do so, it will thereafter pay to the grantors the sum of $152.62 on or before the beginning of each period of three (3) months until a well shall be begun, or this grant is surrendered under the terms hereof; and if it fails to begin said well or make said payments as herein specified, this grant shall become void. . . .

" 'It is fully understood and agreed that for and in consideration of the money paid at the delivery hereof, grantee acquires and continuously has the right or option either to surrender this grant or any part thereof at any time, upon payment of all amounts then due to grantor under the terms hereof, and thereupon to be discharged from all further liability or obligations herein contained as respects the land surrendered, or to continue the grant in force and effect and prevent its forfeiture from time to time, by making quarterly payments, or beginning and drilling wells as herein mentioned, and that in consideration of said payment at delivery hereof, grantor will accept the other payments when tendered and permit the operations mentioned; also expressly renounces and disclaims any right to set up or ask for a forfeiture of this grant or any part or provision thereof, on account of said options.'

"In our consideration of the case, we were of the opinion that the granting and habendum clauses in the lease were so limited by the paragraphs quoted as to make the contract as a whole a mere option, under which, following the decision of your honorable court in the case of Pipe Line Co. v. Teel, 95 Texas, 586, the Magnolia Petroleum Company was not entitled to the benefit of the principle of an innocent purchaser for value in good faith, as it pleaded, basing this conclusion, in addition to the Teel Case, upon section 102 of the late work of James on 'Option Contracts', and the case of O'Neil v. Sun Co., 58 Texas Civ. App., 167, 123 S. W., 172, and Witherspoon v. Staley, 156 S. W., 557; Owens v. Corsicana Petroleum Co., 169 S. W., 192; Varnes v. Dean, 228 S. W., 1007; Hitson v. Gilman, 220 S. W., 140. Should the question become material, under your answers to the questions hereinabove first submitted, then was our conclusion just indicated correct?"

Appellees rely, for answer to question No. 1, upon the case of Campbell v. Fleming, 1 Adolphus & Ellis, 40, and American cases follow-

ing that decision. The plaintiff in that case bought shares in a supposed joint stock mining company upon representations made to him in advertisements, and by agents of the defendant. The whole scheme was a deception. The action was brought to recover the money paid for the shares. Subsequently to the purchase of the shares, the plaintiff formed a new company, by consolidating the shares originally purchased by him with some other property; and he sold shares in the new company, thereby realizing a considerable sum of money. The only element of fraud not claimed to have been discovered by him before he sold the shares was that the shares cost the supposed company less than 5,000£ instead of 35,000£ as was represented to him at the time he purchased them.

In disposing of this case the judges said, respectively:

"Littledale, J. It seems to me that this nonsuit was right. No doubt there was, at the first, a gross fraud on the plaintiff. But after he had learned that an imposition had been practised on him, he ought to have made his stand. Instead of doing so, he goes on dealing with the shares; and, in fact, disposes of some of them. Supposing him not to have had, at that time, so full a knowledge of the fraud as he afterwards obtained, he had given up his right of objection by dealing with the property after he had once discovered that he had been imposed upon.

"Parke, J. I am entirely of the same opinion. After the plaintiff, knowing of the fraud, had elected to treat the transaction as a contract, he had lost his right of rescinding it; and the fraud could do no more than entitle him to rescind. It is said, that another fraudulent representation was subsequently discovered. I cannot, however, perceive that the evidence goes far enough to show that such a representation was, in fact, made.

"Patteson, J. No contract can arise out of a fraud; and an action brought upon a supposed contract, which is shown to have arisen from fraud, may be resisted. In this case the plaintiff has paid the money, and now demands it back, on the ground of the money having been paid on a void transaction. To entitle him to do so he should, at the time of discovering the fraud, have elected to repudiate the whole transaction. Instead of doing so, he deals with that for which he now says that he never legally contracted. Long after this, as he alleges, he discovers a new incident in the fraud. This can only be considered as strengthening the evidence of the original fraud; and it cannot revive the right of repudiation which has been once waived.

"Lord Denman, C. J. I acted upon the principle which has been so clearly put by the rest of the court. There is no authority for saying that a party must know all the incidents of fraud before he deprives himself of the right of rescinding."

Of this decision Black on Rescission & Cancellation, Vol. 2, sec. 559, pp. 1317-1318, says:

"In an English case it is held that when a defrauded purchaser of property elects to abide by his bargain, after he has discovered that he was cheated, and manifests such an election by dealing with the property as his own, he cannot at a subsequent time, undo his election and rescind the contract because he has discovered an additional element of the fraud which was practiced upon him or an additional ground, in the nature of fraud, on which he could have relied for the rescission of the sale if he had known it at the time. But the American decisions do not carry the doctrine to such a length as this. In one of the cases it is said, to preserve a right to rescind a sale, it is not necessary to rescind immediately on the first discovery of a material misrepresentation, but the purchaser may waive that, and yet rescind on the subsequent discovery of other material misrepresentations. Such was also the decision in a case in Alabama, where the matter involved was a sale of patent rights for a given state. The subject was a loom, and it was represented to the buyer, first, that the machine was fit to be worked by hand, and second, that it was fit for use in factories. Within a short time, the buyer found that the first representation was false. He offered to rescind, but the seller refused, whereupon he made some unsuccessful efforts to sell the machine, and then proceeded to test it for use in factories, when he discovered that the representation on that point was likewise false. Being sued for the price, he filed a bill, about three years after the offer to rescind, to set aside the contract. The suit was sustained on the ground that full discovery of the fraud was not made until the trial in a factory. Also it is held that, where one rescinds a contract on grounds which he considers sufficient to warrant him in taking that course, and is afterwards sued for damages, he may resist the suit on a distinct and additional ground, sufficient to have justified the rescission of the contract, though he did not know of it at the time he rescinded it."

The Alabama decision referred to in the above quotation from Black is Pierce v. Wilson, 34 Ala., 596.

Black on Rescission & Cancellation, Vol. 2, sec. 591, p. 1377, states the rule as follows:

"Acts of waiver or ratification after discovery of some out of a number of fraudulent acts will not preclude a rescission upon the discovery of other acts of fraud which, in and of themselves, are sufficient ground for rescission. But at the same time, to make a waiver effectual, it is not necessary that the party should have knowledge of all the incidents of the fraud which was practised upon him or of all of the evidence by which it may be established. 'The duty of rescinding arises immediately upon acquiring knowledge of the substantial and material facts constituting the fraud. It is not requisite that the defrauded party should be acquainted with all the evidence consti-

tuting the fraud before the duty to act by way of rescission arises. When he has evidence sufficient to reasonably actuate him to rescind the contract, and on which he has once acted, no subsequent discovery of cumulative evidence can operate to excuse a waiver of the fraud, if one has in the meantime occurred, or to revive a once lost right of rescission.' Moreover, notice of acts and circumstances such as to put a man of ordinary intelligence and prudence upon inquiry is equivalent to knowledge of fraud necessary to a waiver of the fraud. 'There must be knowledge of facts which will enable the party to take effectual action. Nothing· short of this will do. But he may not wilfully shut his eyes to what he might readily and ought to have known.' "

In the case of Ingram v. Abbott, 14 Texas Civ. App., 583, 38 S. W., 626, 630, Ingram, the owner of the vendor lien notes, induced Abbott to convey land in exchange for them by falsely representing that Kenan, the maker of the notes was a wealthy man and that the land on which a lien was retained to secure the notes was worth $2.50 an acre.

After Ingram discovered that Kenan was, in fact, insolvent he tried to sell the notes and took a conveyance of the land securing them.

Later Abbott discovered the falsity of Ingram's statements as to the value of the land and brought suit for rescission. Ingram defended upon the ground that, after Abbott had learned of the fraudulent representations as to the wealth of the maker of the notes, he had not brought suit promptly but had tried to sell the notes and had taken a conveyance of the land securing them and, by these acts and omissions, had waived the fraud and elected to stand by the contract thereby foregoing and destroying his right of rescission.

The Court of Civil Appeals at Fort Worth refused to sustain that contention and in disposing of the question said:

"The other assignments of error are all overruled, and we consider it necessary to notice only those raising, in different forms, the question of laches or election on the part of Abbott after the discovery of the fraud. It is contended that Abbott knew in February or March of 1893 that Kenan was insolvent and could not pay the notes, and that after he was informed of this fact he elected to waive the fraud and stand by the contract, in that he tried to sell the notes, and took a conveyance of the lands from Kenan, and tried to sell them, and that these acts, under the circumstances, amounted to a waiver of his right to rescind and worked an estoppel upon his right so to do; and this question has given us more trouble than all the rest. We are of the opinion, however, that as the value of the notes, as a safe and good investment, in the estimation of appellee, was based upon two facts, as represented by appellant, to-wit, the solvency of Kenan and

the value of the land, it was not incumbent upon him to ask for a rescission until he was apprised of the falsity of the statements as to both of said facts. Here the question is whether the acts of appellee after learning of Kenan's insolvency should be held conclusively to establish an intended election on his part to abide by the contract. The fraud being proven by appellee, he was entitled to a rescission, unless the appellant then proved that he (appellee) had acquiesced in the fraud, or elected to waive it and stand by the contract. It was incumbent on appellant to establish clearly that such was appellee's intention, after knowing all the material facts, before a court of equity should deny him relief. Here the court finds that appellee did not learn of the true value of the land until a short time before the suit was brought, and that soon after learning that it was worth only $1.25 per acre, instead of $2.50 as represented, he demanded a rescission of the contract, which appellant refused. We think this finding is consistent with the evidence on the subject, and that it is clear that appellee considered the notes good until he learned that Ingram's representation that the land was worth $2.50 per acre was false, and that his efforts to sell the notes after learning of Kenan's insolvency, but before he learned that the land was not worth what Ingram had represented it to be, should not be held to establish a waiver of a fraud that he then knew not of, or an election on his part to stand by the contract, regardless of the falsity of both statements upon which he relied. 2 Pom. Eq. Jur., sec. 917; Tarkington v. Purvis, 128 Ind., 182, 25 N. E., 879; Montgomery v. Pickering, 116 Mass., 230. . . .''

Writ of error was refused upon application distinctly and explicitly presenting the question.

To the same effect is Stelter v. Fowler, 62 Wash., 345, 113 Pac., 1096, 114 Pac., 879.

The rule as stated in Thompson v. Lee, 31 Ala., 292, 303, follows:

'' 'If one who has been defrauded, and has become fully apprised of the fraud, afterwards ratifies such voidable contract, or enters into new stipulations in regard to the subject-matter of the contract, inconsistent with his right to insist on a rescission, and there be nothing more in the transaction, he cannot be heard to complain of such fraud.' It will be observed, that the rule requires that he shall be fully apprised of the fraud.''

The Supreme Court of Maine, in the case of Pitcher v. Webber, 103 Me., 101, 105, 68 Atl., 593, 595, involving the right of one defrauded in the purchase of an automobile to rescind after he had waived some of the misrepresentations first discovered and afterwards discovered other misrepresentations, said:

''. . . A vendee, however, is not bound to rescind upon the first discovery or supposed discovery of some one imperfection or

misrepresentation. He is entitled to time for inquiries, experiments, and tests. He can waive imperfections or misrepresentations first discovered, and yet be afterward entitled to rescind upon the discovery or others. . . .''

We think the rule for which appellant contends a salutary one. To hold a defrauded purchaser to the necessity of bringing suit upon the first discovery of a fraudulent act, regardless of whether or not such discovery revealed the material facts of the fraud, would place him in a perilous position in every case where the seller has acted fraudulently in any degree. It would put the purchaser to a nice calculation as to the exact amount of injury from the fraud that would entitle him to a rescission, for, if he should make the mistake of determining that the revelation of such part of the fraud as has come to his knowledge at a given time is insufficient to justify him in rescinding and to entitle him to a rescission and, consequently, that he should not bring suit then, but afterwards discovers grossly fraudulent acts for which he brings suit for rescission, and in such suit the court determines that the fraud which the purchaser thought insufficient to sustain a rescission is sufficient therefor, he is cut off and barred because he did not bring the suit on such first discovery. Such a rule would encourage litigation and compel the purchaser to bring his suit on discovery of first sufficient evidence of fraud through fear that there might be gross fraud yet undiscovered by him, though he might be willing and even glad to forego a suit and to condone the fraud then discovered but for such fear, even when no additional or other fraud had been practiced by the purchaser. It would, of necessity, tend to convert trustful, confident and peaceable citizens into distrustful, suspicious and litigious characters, and would transmute the practice of the best qualities of mankind into legal penalties.

We think Annie Deaton was not required to bring her suit for rescission before the material facts of the fraud were revealed to her and we do not consider that the falsity of appellee's representation that there were good schools, churches and roads on the Rio Cajones estate constituted the material facts of fraud in the trade between the Deatons and Rush. The Deatons were buying farming lands in Mexico. There is nothing in the certificate to indicate that they were going to Mexico to enjoy accessories of civilization in the form of ways for transportation and means for spiritual and mental development and enlightenment.

We recommend that question No. 1 be answered in the negative.

We will next consider question No. 4.

In Martin v. Burr, 111 Texas, 57, 228 S. W., 543, our Supreme Court through Justice Greenwood, said:

''This court has repeatedly defined an action for the recovery of land. Speaking through Justice Wheeler, the court said in Miller

v. Rush, 17 Texas, 171: 'The recovery of land manifestly has reference to the possession.' The same year, it was said in Hearst v. Kuykendall, 16 Texas, 329, by Chief Justice Hemphill: 'An action for the recovery of lands has a well known and definite signification, and means an action for ejectment, trespass to try title, or a suit to recover the land itself.' Those declarations have been repeatedly cited with approval. Thompson v. Locke, 66 Texas, 386, 1 S. W., 112; McCampbell v. Durst, 15 Texas Civ. App., 522, 40 S. W., 319.''

In the case of McCampbell v. Durst, *supra*, Justice Williams made a clear exposition of the question as follows:

''From the decisions it is apparent that the question, whether or not a particular suit is one for the recovery of land, may depend, not only upon the character of the relief sought, but upon the nature of the title asserted. One holding a title to land, sufficient to enable him to sue directly for its recovery, may proceed merely to obtain some personal redress against the defendant, as incidental to his ownership, and such a suit plainly would not be one for the recovery of the land. Or he may sue to recover the land, and also to obtain additional affirmative relief necessary for his protection in, and enjoyment of, his title, and the fact that the latter feature is added to the suit would not deprive it of its character of one for the recovery of real estate. Day Land & Cattle Co. v. State, supra; State v. Snyder, 66 Texas, 637, 18 S. W., 106. In both these supposed cases it is assumed that the plaintiff possesses a title sufficient to enable him to sue directly for the land, and the character of the suit, whether one for the recovery of land or not, depends, not on his title, but upon the shape he has given to his proceeding. But a person may have an equity entitling him to a decree, which, when rendered, would give him title, but not, in itself, until so enforced, constituting title sufficient to support a simple action for the land. Title, in this State, may, of course, be either legal or equitable, and trespass to try title may be maintained upon one as well as upon the other. But the right of a plaintiff must amount to title of one or the other character, as contradistinguished from the mere equity of the kind just mentioned. The holder of such an equity may sue to obtain a decree enforcing it, and, under our system, may, in the same suit, obtain judgment for the land, as the consequence of the establishment of his equity (Miller v. Rusk, supra); but, unless he is entitled to the former decree, he cannot obtain the latter. This principle underlies the decision in Thomson v. Locke, supra, where it is said: 'The appellant does not claim to have the legal title to the land, but seeks to establish the superiority of the right held by him to that of any other person. To determine whether his claim is well founded, an inquiry into the facts, on which the parties base their respective claims, must be made, and, if found

in his favor, the decree to be rendered as to his adversary would be a decree that he has the superior right to the land, followed by such orders as may be necessary to protect the right thus established against the assertion of the adverse claim in any other court or in any of the departments of government.' If the plaintiff in such an action shows right to a decree which, when rendered, would invest him with title sufficient to maintain an action for the land, he may doubtless, aside from questions of venue and other questions of mere procedure, obtain both .the affirmative decree and judgment for the land in one action. But the judgment for the land would be the consequence, merely of the relief primarily granted, and could not, but for that relief be recovered. And hence it is obvious that the question, whether or not that primary relief should be granted, is to be first determined by the same rules which would govern if the suit were for it alone. If, for instance such an action were stale or barred by limitation, obviously this could not be avoided by connecting with it a prayer for the recovery of the land. This could not make the action one for the recovery of land, because the title relied on would not be sufficient. The plaintiff would have no title unless and until he should obtain the decree establishing and enforcing his right, and he could not get that decree because his action for it would be barred. Chamberlain v. Boon, 74 Texas, 659, 12 S. W., 727; Id., 82 Texas, 480, 18 S. W., 655.''

A deed obtained by fraud is not void but voidable only. As between the original parties Rush's title is prima facie good, and it could only be avoided by a suit and a decree annulling and cancelling the deed. Cook v. Moore, 39 Texas, 255. The deed to Rush conveyed all of Mrs. Deaton's title. None of it was left in her. Before Mrs. Deaton could have maintained a suit for the recovery of the land, she must have established a right to it superior to that of any other person. To determine whether her claim was well founded, an inquiry into the facts on which she and Rush based their respective claims, must have been made, and if such facts were found in her favor, the decree to be rendered would have been that she had the superior right to the land, thereby establishing a foundation upon which to base a recovery of the land. Previous to the establishment of such a right no such foundation existed. The establishment of such a right would involve, as a consequence, the cancellation of the deed and would remove the barrier to a judgment for the land itself which, as shown above, might all be done in the same suit. ''But the judgment for the land would be the consequence, merely, of the relief primarily granted, and could not, but for that relief, be recovered.''

We are of the opinion that question No. 4 should be answered in the negative.

We now pass to question No. 3.

In Port Arthur Rice Milling Co. v. Beaumont Rice Mills, 105 Texas, 514, 143 S. W., 926, our Supreme Court said:

"Before it can be said that a cause of action exists in a legal sense, there must be such a mature right as may be declared upon and maintained, subject only to such valid defenses by which it may be defeated. In 25 Cyc., 1065, the rule is laid down as follows: ' '' The accrual of the cause of action'' means the right to *institute* and *maintain* a suit; and whenever one person may sue another a cause of action has accrued and the statute begins to run.'

"Again in 25 Cyc., 1065, it is said: 'The statute of limitation begins to run from the time when a complete cause of action accrued, that is, when a suit may be' maintained, and not until that time.' ''

In answer to question No. 4 we have held that no suit for the recovery of the land could have been maintained before the cancellation of the deed. Until such cancellation there could be no such "mature right to recover the land as might have been declared upon and maintained subject only to such valid defenses by which it might have been defeated." The deed to Rush itself was a complete answer to any suit for the recovery of the land, irrespective of its voidability, until its power for that purpose had been destroyed by the inquiry into and establishment of the rights of Mrs. Deaton arising out of the fraud by which the deed was obtained. Therefore, her cause of action, for the recovery of the land in the legal import of that term, did not accrue "before the cancellation as title of her deed to Rush." Thus we answer question No. 3.

We will now consider question No. 5.

Article 5674, R. S. 1911, as far as applicable, reads:

"Every suit to be instituted to recover real estate as against any person having peaceable and adverse possession thereof, cultivating, using or enjoying the same and paying taxes thereon, if any, and claiming under a deed or deeds duly registered, shall be instituted within five years next after the cause of action shall have accrued, and not afterwards."

Mrs. Deaton does not come within any of the exceptions enumerated in article 5684.

But as already decided above the action here is not one to recover land. Hers is an action for cancellation of a deed secured by fraud and is governed by Art. 5690, reading as follows:

"Every action other than for the recovery of real estate, for which no limitation is otherwise prescribed, shall be brought within four years next after the right to bring the same shall have accrued, and not afterward."

Article 5708, under general provisions, reads:

"If a person entitled to bring an action other than those mentioned in chapter one of this title be at the time the cause of action accrues, either:—

"1. Under the age of twenty-one years;

"2. A married woman;

"3. Of unsound mind; or

"4. A person imprisoned; the time of such disability shall not be deemed a portion of the time limited for the commencement of the action; and such person shall have the same time after the removal of his disability that is allowed to others by the provisions of this title."

Therefore no limitation ran against Mrs. Deaton in her action for cancellation of the deed. We pass then to consider whether, though not barred from cancellation, she is barred by the five year statute, above quoted, from recovering the land. It is observed that limitation under the five year statute begins to run only "after the cause of action shall have accrued." In answering the fourth question, we have held that Mrs. Deaton could not have maintained a suit for the recovery of the land before the cancellation of the deed to Rush and in answering the third question we have held that her cause of action for the recovery of the land did not accrue before the cancellation as title of that deed. It is suggested that Mrs. Deaton might have brought her suit for cancellation at any time after discovery of the fraud and, in that same suit and as a consequence of the cancellation of the deed, could have recovered the land; that, therefore, the five year statute of limitation began to run from the date of the discovery of the fraud. The answer, as we see it, is that such a suit would not have been a "suit for the recovery of land" and the statute affects only "every suit to be instituted to recover real estate," and therefore has no application to the recovery of land as an incident and consequence of personal action such as an action for cancellation of a deed. Art. 5679 provides that:

"Whenever in any case the action of a person for the recovery of real estate is barred by any of the provisions of this chapter, the person having such peaceable and adverse possession shall be held to have full title, precluding all claims."

But neither this statute nor the five years statute of limitations is applicable to the recovery of land incidental and consequential to a personal action where there has never been in the plaintiff a cause of action to recover real estate as is the case here.

The cases of Roseborough v. Cook et al., 108 Texas, 364, and Davis v. Howe, 213 S. W., 609 are not applicable to the question. In neither of those cases had the plaintiff executed a deed conveying title out of himself. In each of those cases the defendant claimed under a deed from another than the plaintiff. In each of those

cases the plaintiff based his claim to the land on the deed and title of himself. One of those cases was an action in trespass to try title, the other was a suit for partition—each a possessory action—a suit for the land.

McCann v. Welch, 106 Wis., 142, 81 N. W., 996 is no authority for the contention of appellee in this case. An inspection of the case reveals the fact that the decision was rested upon the statutes of Wisconsin.

Articles 4211, 4212, and 4215, of the statute were pleaded in that case. Changing the order of those statutes, they are:

"Section 4215. An adverse possession of ten years under sections 4211 and 4212 or of twenty years under the two last preceding sections shall constitute a bar to an action for the recovery of such real estate so held adversely or of the possession thereof.

"Section 4211. Where the occupant or those under whom he claims entered into the possession of any premises under claim of title, exclusive of any other right, founding such claim upon some written instrument, as being a conveyance of the premises in question, or upon the judgment of some competent court, and that there has been a continual occupation and possession of the premises included in such instrument or judgment or of some part of such premises under such claim for ten years, the premises so included shall be deemed to have been held adversely; except that when the premises so included consist of a tract divided into lots the possession of one lot shall not be deemed the possession of any other lot of the same tract.

"Section 4212. For the purpose of constituting an adverse possession by any person claiming a title founded upon some written instrument or some judgment land shall be deemed to have been possessed and occupied in the following cases:

" (1) Where it has been usually cultivated or improved;

" (2) Where it has been protected by a substantial inclosure;

" (3) Where, although not inclosed, it has been used for the supply of fuel or of fencing timber for the purpose of husbandry or for the ordinary use of the occupancy;

" (4) Where a known farm or a single lot has been partly improved the portion of such farm or lot that may have been left not cleared or not inclosed, according to the usual course and custom of the adjoining country, shall be deemed to have been occupied for the same length of time as the part improved or cultivated."

It is seen that these statutes, unlike ours, have no reference to the time of the accrual of the cause of action. Under them, ten years possession constitutes a bar to the recovery of real estate irrespective of the time of the accrual of the cause of action. Under our statutes, as above shown, limitation begins to run only "after the cause of

action shall have accrued.'' Under the statutes of Wisconsin, limitation in a suit for recovery of real estate begins to run absolutely and unconditionally at the beginning of the ten years and where they have no direct application to a suit as limitations upon the right to bring it, the possession begins to ripen into a title in the possessor at the same time it would begin to run if the suit were one for recovery of real estate—at the beginning of the ten years—and perfects the title at the end of that time. Under our statute, adverse possession in a suit for recovery of real estate begins to run "after the cause of action·shall have accrued" and in a suit where it has no direct application as limitations upon the right to bring it, adverse possession begins to ripen into a title in the adverse possessor only after the cause of action shall have accrued. Hence, McCann v. Welch does not support appellee's contention. Since Mrs. Deaton never had a cause of action for the recovery of the real estate Rush's possession never began to ripen into a title absolute.

We conclude that the first question in questions numbered five should be answered in the negative.

In view of the answers made we do not consider it necessary to answer question No. 2.

We pass now to a consideration of the sixth question. There are expressions in the Teel Case cited in the certificate which might be interpreted as supporting the contention that the Magnolia Petroleum Company's lease was not entitled to the benefit of the principle of innocent purchaser for value in good faith. However, it is possible that the decision in that case was rested upon the theory that only a nominal consideration was paid and that the real consideration was development which could not be enforced by the lessor. If this is not true, then, if the Teel case has not been overruled by our Supreme Court, in the case of Gilmore v. O'Neil, 107 Texas 18, it has, at least been ignored in that opinion.

In that case the contest was between O'Neil, as the owner of the equitable and superior title to a tract of land upon which an oil lease had been executed by the apparent owners of the land and Gilmore and Nicholson to whom the lease had been assigned. The question was whether or not Gilmore and Nicholson were protected as innocent purchasers for value without notice. If the lease, in that case, created no estate in the land, then the Teel case was applicable and Gilmore and Nicholson could have been denied the defense of innocent purchaser on the authority of that case. Instead of doing so, the decision was placed on the ground that the plaintiffs had notice and the Teel case was not referred to and was, in effect, overruled. The tenor of the opinion is such that the conclusion that the Supreme Court would have held Gilmore and Nicholson innocent purchasers of a legal title but for notice is inescapable. The question ·

was involved in the case of Erwin v. Olsen, 241 S. W., 473 (Com. App. sec. B) and the law of innocent purchaser was applied but not discussed.

Without elaborating our views on the matter, we think that a lease conveying oil and gas in place for a valuable consideration with the right to enter and appropriate creates and conveys to the lessee an estate in the land itself and is not a mere option and conclude that question No. 6 should be answered in the negative.

The opinion of the Commission of Appeals answering certified questions is adopted and ordered certified to the Court of Civil Appeals.

C. M. Cureton,
Chief Justice.