### NU–ENAMEL PAINT CO. v. DAVIS.

### No. 12875.

Court of Civil Appeals of Texas.
Fort Worth.

July 15, 1933.

Rehearing Denied Sept. 23, 1933.

John Davis, of Dallas, for appellant.

Hampden Spiller, of Fort Worth, for appellee.

DUNKLIN, Justice.

On the 16th day of October, 1931, the Nu-Enamel Paint Company, as seller, entered into a contract in writing with M. V. Davis, denominated as distributor, by the terms of which the seller appointed Davis "as the authorized Distributor for Nu-Enamel Products in the following territory, for a period of one year with renewal rights hereinafter specified. Tarrant County and the City of Fort Worth and the Nu-Enamel Store located at Fourth and Main Streets, and 48 other counties lying west and northwest of Tarrant County, comprising the West Texas Wholesale District, all in the State of Texas.

"That the distributor hereby buys from the seller and the said seller hereby sells to the said distributor the merchandise specified in this order and agreement, at prices and discounts and on the terms and conditions stated herein and no other, F. O. B. factory:

"An agreed store stock now located in the Fort Worth Store and Paint Shop located at Fourth and Main Streets

| | |
|---|---|
| City of Fort Worth, Texas | $4,400.00 |
| Less distributor discount of 50% | 2,200.00 |
| Net amount of merchandise purchased in this order | $2,200.00 |
| O Nu-Enamel Metal Display Racks at $5.00 each | 0000.00 |
| Total amount of this order net | $2,200.00 |

"This order paid in full as follows, $1,100.00 cash this date, the balance to be paid monthly in installments representing the difference between Sales and an allowance of $200 as monthly salary to Davis."

The contract further provided:

"1. That the distributor shall purchase and pay for an annual quantity requirement or quota of 200 cases of 24 cans of 24 oz. each (or equivalent thereof in other sizes) of Nu-Enamel products at a discount of 50% off the retail price stamped, printed or otherwise appearing on said product F O B factor or nearest distributing point, and shall order and pay for each month a prorata quantity of the said annual requirement or quota specified, which quantity requirement or quota to be so ordered and paid for shall be proportioned to the months of the year and the time of purchase and the quantity purchased each month shall be and is hereby declared of the essence of this agreement.

"2. That the distributor shall efficiently and actively promote and cover the sales of said product throughout the entire territory and shall, and hereby does accept, take over, supervise, cooperate with and supply all subdealers of Nu-Enamel now, or may in the future become active in said territory whose rights are subject to said distributor and further agrees and understands that with respect to time and quantity of purchase and the territory herein assigned, the distributor is a sub-agent with rights subject to any general agent for said product now, or may in the future become, active in the territory above mentioned and described, and the distributor shall be and is hereby bound by the terms of any said general agent's contract, which contracts the seller herein mentioned or the manufacturers of said products, hereby have and retain the right to exe-

cute at any time during the life of this agreement.

"3. That the seller shall promptly fill and ship (except in case of fire, strikes or acts of God) all orders from distributor upon due receipt thereof, and shall not make shipments in to the hereinabove described territory except to distributor and sub agents or dealers specified hereunder, and any earnings over and above distributor's prices arising out of such shipments shall be credited to the account of the distributor of which the seller agrees to keep and maintain proper records and account without expense to distributor and shall furnish each month, during the life of this agreement, statement of account with remittance covering any such earnings."

Other stipulations followed to the effect that 10 per cent. of the net amount realized by defendant from the sales to Davis would be used for advertising the products in the forty-eight counties covered by the contract, and with this further provision in the sixth paragraph of the contract:

"Also that the prices and discounts hereinabove specified are net and not subject to any other discounts or allowances of any kind and that all checks or other form of payment given in connection with this, or subsequent orders for said product, must be made payable direct to the seller."

The contract concludes with this stipulation:

"9. That this agreement supersedes and voids any and all other agreements, between the parties hereto, and before executing same the distributor has read and fully understands each and every provision and condition thereof, and that no representations, verbal or written, express or implied, other than those herein contained, shall be valid or binding on the seller or the manufacturers of said product, and shall be in all things performable in Dallas, Texas, and shall not be valid until approved by seller."

Davis instituted this suit against the Nu-Enamel Paint Company to rescind that contract and to recover the $1,100 cash paid by him when the contract was executed, plus certain items of expense incurred hereinafter noted, and from a judgment in his favor the defendant has prosecuted this appeal.

As grounds for rescission the plaintiff alleged that prior to the execution of the contract and as an inducement to Davis to execute the same, C. J. Lloyd, agent of defendant, represented to him that there was no distributor of the Nu-Enamel Paint Company in Fort Worth and Tarrant county and that plaintiff would be sole distributor of all the products of defendant to be distributed in Tarrant county, Tex.; and further represented to the plaintiff that there were no racks then exhibited in Fort Worth for the display of Nu-Enamel goods, and that plaintiff would have the exclusive right of display-

ing such racks; and that plaintiff relied upon the truth of such representations and was induced by each of them to execute the contract; and that both of said representations were false.

In answer to special issues the jury sustained each and all of those allegations.

Plaintiff's pleadings contained further allegations in substance that on or about January 1, 1932, after he had discovered the falsity of the representations which induced him to make the contract, he demanded of defendant a return of the $1,100 he had paid under the contract and tendered to defendant the stock of paint then on hand and undisposed of, which demand and offer was refused by the defendant. Further, that before he learned that he had been defrauded he spent three months' time in an effort to dispose of the paints and that his services were reasonably worth $200 per month; also that he had expended $322.48 but realized $622.65 from the sale of the paints; further that after January 1, 1932, in order to save from injury the paint left on hand after his repudiation of the contract, he undertook to sell the same and did realize therefrom $270.52, but expended in attempting to make such sale the sum of $292.25. He further alleged that there still remained on hand certain paints on which he claimed an equitable lien to secure the payment of the $1,100 he paid to the defendant and the expenses incurred in attempting to sell the products including a reasonable allowance for his services in connection therewith after allowing as credits the amount realized by him from the sale of the products.

In answer to further special issues the jury found that the reasonable expenses incurred by the plaintiff in making the sale of the paint after January 1, 1932, was $300, and that his services during the time he spent in charge of the Fort Worth store in acting as a distributor of the paint was $1,200.

There were further findings by the trial court that up to the time that plaintiff offered to rescind the contract between him and the defendant, plaintiff realized $622.65 from the sale of the paints and incurred expenses in making those sales of $332.48, and that the sales of the paint after the plaintiff offered to rescind—which was on January 1, 1932,—was the sum of $270.52.

Judgment was rendered in plaintiff's favor for the $1,100 which he had paid to the defendant on the contract plus $600 for his services in an effort to sell the products— that being the amount claimed in his pleadings—and plus $300 necessary expenses incurred by the plaintiff after January 1, 1932, in an effort to sell the paint. The total of those items was $2,047.02, against which the defendant was allowed a credit for the amount realized by the plaintiff from the sale of the paints in the sum of $290.17 up to

January 1, 1932. After deducting those credits there was a balance of $1,486.33 and for that amount plaintiff was awarded a recovery.

The contract sued on did not stipulate that plaintiff was to be the sole distributor of the defendant's products in the territory designated, nor did it contain any stipulation binding plaintiff to sell the balance at any fixed sum; to the contrary, according to the contract, Davis agreed to pay 50 per cent. of the retail market price of any paints bought from the defendant in the future. Hence, we overrule the assignments of error presenting the contention that the contract was in violation of the Texas anti-trust law (Vernon's Ann. Civ. St. art. 7426 et seq.). The decision by appellant, New Century Mfg. Co. v. Scheurer (Tex. Com. App.) 45 S.W.(2d) 560, is not in point since the contract there construed did stipulate a fixed price for which the articles contracted for should be sold.

The case of Cook Co. v. Page (Tex. Civ. App.) 294 S. W. 934, is likewise distinguishable from this in that the contract there condemned as being in violation of our anti-trust laws was one which gave the dealer the exclusive privilege of selling beer at wholesale in certain counties.

The contract involved in the case of Watkins Co. v. McMullan (Tex. Civ. App.) 6 S.W. (2d) 823, was condemned because it confined a party to a certain area for transacting business. Manifestly, the facts of that case distinguish it from this case.

It is insisted that there is no support in the evidence for the finding of the jury that Davis was misled by the misrepresentations alleged in his pleadings. It is pointed out that the contract was for the sale of a stock of paints then on hand in Fort Worth and it is argued that the plaintiff must necessarily have known that those paints were then being sold in Tarrant county and had been on sale prior to the execution of the contract. We do not believe that such a recital would necessarily overcome the plaintiff's testimony that at the time he did not know that there was any other distributor in Fort Worth undertaking to sell defendant's products; and that he was misled by the misrepresentations of defendant's agent to the contrary.

The evidence shows that from October 18 to October 30, 1931, which was after plaintiff had executed the contract, he worked with defendant's agent in attempting to sell the stock of paints on hand and after October 30th he took sole charge of the business and operated the same until January 1, 1932, when he repudiated the contract. Appellant insists that the evidence shows without dispute that during that time he was fully informed that other parties in Fort Worth were handling defendant's paints and that a number of racks used in the display

of the same were in use in Fort Worth and in other places. The contention is then made that plaintiff having proceeded with the performance of the contract after acquiring such information, he thereby ratified the contract and waived his right of action for rescission. It is true that plaintiff testified that prior to January 1, 1932, and after the execution of the contract, he was informed of other persons offering to sell defendant's paint and that he reported the same to Mr. Lloyd, defendant's agent. But he further testified without contradiction that Lloyd repeatedly promised that he would gather up and take back the paint that was being handled by other persons; that plaintiff relied upon those promises until the latter part of December, 1931, when he discovered that Lloyd had not kept his agreement and that the defendant's products were being sold all over town. According to his testimony he thereupon decided to repudiate the contract and so notified Lloyd. In view of that testimony it cannot be said, as a conclusion of law, that plaintiff ratified the contract after discovering the alleged fraud and waived his right of action to rescind. Nor did appellant request a submission of the issue of ratification by reason of those facts and therefore waived its right to complain here. Ormsby v. Ratcliffe, 117 Tex. 242, 1 S.W.(2d) 1084.

The evidence shows that after Davis repudiated the contract on January 1, 1932, and the defendant refused to take back the stock of paints on hand, he continued his efforts to sell the paints until some time in May, 1932, when he abandoned any further efforts and stored the remainder of the stock at his home.

It is insisted that none of the expenses incurred by the plaintiff for services or otherwise can be recovered in plaintiff's suit which was a suit for rescission of the contract. In that connection the familiar rule is invoked that if a party is defrauded he is put to his election either to sue for rescission and for a return of what he has parted with or else to affirm the contract and sue for his damages. Shappirio v. Goldberg, 192 U. S. 232, 24 S. Ct. 259, 48 L. Ed. 419; Witherspoon Oil Co. v. Randolph (Tex. Com. App.) 298 S. W. 520. But it is a further rule, as announced in Black on Rescission and Cancellation, vol. 2, page 623:

"The person with the property thus left in his possession, on the other's refusal to receive it, in fact holds it in the character of a bailee, and he must use all reasonable care to make the other party's loss as light as possible, and must not willfully allow the property to deteriorate or to be destroyed, although he has the right to do any acts in regard to the property reasonably necessary to protect his own interests, and at the same time maintain his claim to rescind. But he cannot keep the property for an indefinite time thereafter and recover from the other party the expense of so keeping it."

This was cited with approval in Alexander v. Walker (Tex. Civ. App.) 239 S. W. 309, in which expense for caring for cattle in addition to the amount paid therefor was recoverable in a suit for rescission. That rule is applicable here in view of the uncontradicted testimony of plaintiff that the reason for his continued efforts to sell the paint after he had rescinded the contract was to save loss which would have resulted from a deterioration in value while being held in the store; and no testimony was offered contradicting that testimony. And the judgment of the trial court implies a finding that by reason of the facts so proven the expenses incurred in thus attempting to minimize such loss were not incurred with any intention of plaintiff to treat the property as his own and thereby waive his right to a rescission of the contract.

For the reasons indicated, all assignments of error are overruled and the judgment is affirmed.

### On Motion for Rehearing.

In opinion on original hearing it was stated in effect that the uncontradicted testimony of plaintiff was that the reason for his continued efforts to sell the paint after he had rescinded the contract was to save loss which would have resulted from a deterioration in value while being held in the store. Upon a further examination of the record we have discovered that that statement is incorrect and it is now herewith withdrawn.

Appellee, Davis, testified in substance that before the 1st of January, 1932, he was told repeatedly that other dealers in Fort Worth had been selling and were still selling the same paint at a lower price than he was offering it; that he made repeated complaints to Lloyd, appellant's representative, of those rumors and on each occasion Lloyd promised to take up from those dealers all the stock they had on hand, which he failed to do; that finally he notified Lloyd of his intention to rescind his contract with the paint company and thereupon offered to return the paint then on hand and demanded the return of the money he had paid out thereon, which demand was refused.

Appellee testified in part as follows:

"Q. Now, as to this paint that you had on hand, what was the condition of it—in your opinion, would it keep and be good? A. I have had some of it that dried up.

"Q. Dried up? A. Yes, sir; in other words, it seemed like the pigment would go down to the bottom of the can, and I had to make several cans good.

"Q. Had to make them good? A. Yes, their Peter Pan blue, they call that color, that color, in particular, it got to where it was more of a grey than it was a blue.

"Q. What did you do with this paint that they would not take back and wouldn't give you your money on? A. Well, I could not get my money back, and I didn't know for sure if I was going to get my money back, so I—I had been told that I couldn't get anything out of them, and so I went ahead and tried to sell a lot of it, kept trying to sell it, and I sold all that I could, but my expenses generally were greater than my profits.

"Q. And you abandoned that? A. Yes, sir, I abandoned that.

"Q. Now the expense that you incurred there, was it reasonable and necessary? A. Yes, sir.

"Q. In order to make those sales? A. Yes, sir, absolutely.

"Q. Now, when you concluded that you couldn't sell this paint, what did you do with it—did you have it on hand—have a balance on hand? A. Yes, and I have the balance on hand, and I have it stored."

The statement that is withdrawn as shown above was occasioned by reason of the first portion of the above testimony, to the effect that the paint deteriorated while being held by appellee after appellant had refused to accept a return of it. It is insisted by appellant that the foregoing testimony shows conclusively that the act of Davis in selling the paint left on hand was for the purpose of reimbursing himself for the money which he had paid appellant therefor, and therefore that act showed a waiver of his right of rescission. We are unable to concur in that view. In the first place his right of rescission had theretofore accrued when he notified appellant of his intention to rescind and demanded a return of his money and had tendered back to appellant all the paint left on his hands. Then, too, whether or not he waived his right to a rescission involved the issue of his intention so to do, which was a disputed issue to say the least; and the act of selling the paint in order to reimburse himself would not of itself establish such waiver. Witherspoon Oil Co. v. Randolph (Tex. Com. App.) 298 S. W. 520.

Furthermore, the following was said in 2 Black on Rescission and Cancellation, § 629, p. 1455: "When the seller of goods persistently refuses to take them back, after being notified of the rescission of the sale by the purchaser for sufficient cause, it is proper, if not obligatory, for the purchaser to take such measures as are expedient to save unnecessary loss to the seller, and if the best method of accomplishing this end is to sell the property (as, in the case of perishable goods) he may sell it 'for account' of the vendor for the best price obtainable, and retain out of the proceeds enough to reimburse him for necessary expenses, and hold the balance subject to the vendor's demand."

That authority was also cited with ap-

proval in Alexander v. Walker (Tex. Civ. App.) 239 S. W. 309.

Moreover, the issue whether or not appellee elected to waive his right of rescission of the contract with appellant and recover back what he had paid on the contract and the expenses incurred in endeavoring to sell the remainder on hand was not submitted to the jury, nor did appellant request its submission, and therefore it waived that defense, at all events, under the decision of Ormsby v. Ratcliffe, 117 Tex. 242, 1 S.W.(2d) 1084.

The motion for rehearing is overruled.