H. Carl VANDERVOORT, Jr., et al.,
Appellants,

v.

H. E. SANSOM, Appellee.

No. 15725.

Court of Civil Appeals of Texas.

Fort Worth.

June 8, 1956.

Rehearing Denied Sept. 7, 1956.

Henry Mack and Cal Estill, Fort Worth, for appellants.

Mays & Mays, and Charles Lindsey, Fort Worth, for appellee.

MASSEY, Chief Justice.

This is an appeal by the defendants from a judgment for the plaintiff rescinding a contract of sale to plaintiff of a coin-machine business, inclusive of the machines and the route on which they were operated under percentage of profit agreements with the merchants in whose stores the machines were located. Substantially, the basis of defendants' appeal is their claim that the evidence established that plaintiff had waived the fraud found by the jury in connection with the defendants' representations which induced plaintiff's purchase and/or that he was estopped to claim relief in equity because of his conduct and delay after discovery of the fraud and also after the suit was pending.

The judgment is affirmed.

Not all the various alleged fraudulent representations were found to have been false, been made for purpose of inducing plaintiff to purchase, been a material in-ducement to the purchase, believed by plaintiff at time he purchased, and relied upon in making the purchase. However, three of the alleged fraudulent representations were severally found by the jury to have been. By its answers the jury established that these three were as follows: (a) Exhibition of collection slips shown plaintiff, all showing a gross profit per week per machine on location and in operation, after the commission had been paid to the merchant on whose premises the machine was located, of $33.33 or more, along with representation that said slips were representative of the average machine on location; (b) representation that under no conditions had returns from an average group of machines, after commissions were paid, been less than $25 per week or $100 per month; (c) representation that as to a "substitute" established route and the machines located thereon (to be replaced by new machines) and accepted by plaintiff in the stead of those originally contracted for but not received far exceeded $25 per week or $100 per month average per machine gross profit, after commissions were paid.

We have carefully examined the evidence in the record and are of the opinion that by the date (the latter part of July, 1954) plaintiff testified that he was in possession of knowledge that all the alleged representations (inclusive of these three) were fraudulent, reasonable minds could differ as to whether it was a fact that he had not theretofore learned of the falsity of the representations found by the jury and listed by us as (a) and (c). Questions of fact were presented for this reason, if not for other reasons, of the timeliness of plaintiff's proffered rescission. We believe that the evidence does conclusively establish that plaintiff knew of the falsity of the representation listed by us as (b) and had waived any fraud in connection therewith, hence no question of fact existed thereupon. However, the fact that plaintiff knew of the falsity of (b) at such a time that his subsequent action and conduct might be

such as would foreclose recourse to the equitable remedy of rescission because thereof, he would not be foreclosed from recourse to such remedy because of fraudulent representations (a) and (c). A purchaser may be willing to waive one or more acts of fraud in such instances where he would at the same time be unwilling to waive another or others which operated in conjunction therewith, or independently, to induce him to enter into the contract. It is the act or acts of fraud which he is unwilling to waive and has not waived upon which he necessarily predicates any proper suit for rescission. Deaton v. Rush, Tex. Com.App.1923, 113 Tex. 176, 252 S.W. 1025; Ingram v. Abbott, 1896, 14 Tex.Civ.App. 583, 38 S.W. 626, error refused.

To review briefly the history of the controversy, it is noted that the transaction leading up to the contract entered into by the parties began with an advertisement in the Fort Worth Star-Telegram of Sunday, March 21, 1954. In this advertisement "money making routes of coin operated Kiddie Karousels" being established in various cities in Texas were offered with the invitation for interested persons to write to a box of the newspaper. The Kiddie Karousels, the machines in question, are sort of "two-man", or more correctly "two-child", "merry-go-rounds", which operate on a turn-table moving caricature horses and rabbits for about a minute and which start upon the dropping of a coin in a coin box attached thereto. They are manufactured and located by the defendants, H. Carl Vandervoort, Jr., et al., doing business as the Texas Kiddie Rides Company, in various mercantile establishments under individual agreements with merchants whereby they receive a percentage of the "take" from the coin boxes when these boxes are periodically "robbed" by the operator of the machines. In some instances the agreement involves a "robbing" of the coin boxes by the merchants themselves, who deduct their proper commissions and mail the balance to the machine operator-owner. The defendants sell the machines "on location, in operation" along with the individual agreements with the merchants, to purchasers thereof. It was such an offer that was made in the advertisement of March 21, 1954. It is of interest to note that the advertisement stated that the "routes" offered consisted of from 10 to 100 machines along with the statement that "incomes (therefrom) will vary from $500 to $5,000 per month, depending upon the mumber of machines on location in each route." This would be a minimum of $50 per month and a maximum of $500 per month per machine.

As a result of plaintiff's answer to the advertisement a representative of the defendants called him and arranged a personal meeting in Fort Worth. Upon the occasion of this meeting an agent of the defendants, assisted by defendant Vandervoort, sold plaintiff on taking a route or routes consisting of thirty (30) new machines, to be placed on locations supplied by defendants, in operation, and delivered to plaintiff. A contract to this effect was entered into under date of March 27, 1954. The representations inducing plaintiff to so contract included those found by the jury and heretofore listed by us as (a) and (b).

About a week later the same representative of the defendants negotiated further with plaintiff. He advised plaintiff that there was some difficulty and delay in getting his new machines manufactured and located and placed in operation so that he would have an operating route. He advised plaintiff that defendant Vandervoort had a route which was in operation and where there were already thirty machines located, two of which were "boat-rides" rather than Kiddie Karousels. He stated that he had convinced Mr. Vandervoort that defendants should be permitted to offer this route to plaintiff in substitution of the one contemplated to be established and that this could be done if plaintiff would pay an additional $1,000 for the two "boat-rides". It is not absolutely clear in the statement of facts but appears that in the

substitute transaction plaintiff would get new Kiddie Karousels replacing the older ones already on the route and in operation, would have the "boat-rides" in the shape and at the locations where they were in operation, and would have the two additional new Kiddie Karousels delivered to him, on location and in operation, as soon as they were manufactured. Plaintiff accepted this contract in substitution and paid an additional $1,000 upon representations including that found by the jury and heretofore listed by us as (c).

In the early part of April, 1954, plaintiff, having moved to Fort Worth in the interim, went to the defendants' offices prepared to take charge of the business purchased. While it is inconsequential, not having been found by the jury to constitute a fraudulent ground because of which plaintiff was entitled to rescind, he found that only fourteen machines were on location on the route at that time. However, by May 1, 1954, all thirty-two machines were located and in operation. In April plaintiff received the "mail ins" on four machines located out of town, where the merchants robbed the boxes, deducted their commission, and mailed the balance to the operator-owner. The weekly gross profit so received on all four machines was between $11 and $12. A subsequent check on the same machines did little better than this. Plaintiff took the matter up with defendant Vandervoort and asked him what the average weekly "take" ran on the four machines and was informed that it was $19.03 per machine. Plaintiff complained and Vandervoort told him that the machines were old and that when the new machines were placed in their stead the income from the locations should rise. Plaintiff was in position by about May 10, 1954, to observe the properties he had purchased and in a general way to note the profits being derived therefrom. Some machines in some locations did quite well, others very poorly. His average weekly gross receipts per machine, after commissions were paid, was running considerably less than the $25 he

thought he would receive. He complained to Vandervoort, who stated that he would try to help and indicated that he would "do something about it." What, if anything, was ever done is quite nebulous. It appears that as they were available the old machines were being replaced by new ones, but just when this was done, or the locations affected thereby, obviously left the jury to do a certain amount of speculation.

The unpaid balance on plaintiff's purchase was represented by a note which was transferred by the defendants to a bank with recourse, and this note called for twelve monthly payments of $920.83. Plaintiff paid the first of these on June 9, 1954, a day before due date, and his wife paid the second on July 8, 1954. The bank thereafter transferred the note back to the defendants and at the time of the suit they were the holders thereof. Plaintiff never made any payments after July 8th. The fact that the note belonged to the bank at time the payments were made is not a factor in this case, and the matter may be and is considered the same as though payments had been made to the defendants.

On August 6, 1954, plaintiff tendered rescission. The defendants refused to accept the tender. A week later plaintiff filed suit. The machines were at the time "on location, in operation" and plaintiff continued to "rob" the coin boxes, keeping account of the proceeds therefrom. This method of procedure continued for a period of from two to three months, after which a receiver was appointed to operate the machines.

It is the position of the defendants that plaintiff delayed a period of approximately two months after he had discovered that he had been defrauded before making a tender, making the June and July payments on his installment note, and that because thereof he was foreclosed as a matter of law from obtaining a rescission. Further, the defendants take the position that plaintiff's continuing to collect revenue from the coin boxes between the time he

filed suit and until the receiver was appointed likewise foreclosed the form of relief sought by plaintiff. The defendants plead waiver and estoppel.

██ We are of the opinion that the question must be resolved against the defendants, and that the matter was for the jury, plaintiff not being foreclosed as a matter of law. Restatement of the Law, Contracts, sec. 480 et seq. and Restatement of the Law, Restitution, sec. 64 et seq. are informative. The same thing is true of the annotation of the matter "Time for rescission by purchaser of chattel for fraud or breach of warranty" in 72 A.L.R. 726. What is a reasonable time within which a defrauded person must evidence an intent to rescind because of fraudulent representations inducing a contract depends upon the circumstances of each case. Time is material so far only as, when associated with other circumstances, it may produce injury or unjust consequences to the defendant or third persons. The value of decisions as precedents, especially so far as they regard periods of time, lies largely in similarity of circumstances. Consideration is to be necessarily given to matters other than the mere expiration of time, such as use, destruction, loss, or impairment of the property, for if the equitable remedy of rescission is to be available there must exist the ability to place the parties in statu quo, though this does not mean that the subject property itself, in unaltered state, rather than proceeds or profits therefrom derived, is what must be restored or tendered.

██ The cases logically make a distinction between automobiles, tools, etc., use of which would promptly demonstrate the fact of fraudulent representations, and other property, such as business operations or complicated machinery, which must be given a more extensive test involving a longer period of time logically to be taken in a conclusion that representations had been fraudulent. There are many instances involving jacks and stallions sold for breeding purposes where discovery that the representations of their efficacy and excellence was delayed many months before the fraud could be said to come within the the knowledge of the purchasers. The cases additionally distinguish the type of instance wherein the defrauded persons begin to express doubts and objections to the sellers that the subject property or businesses were not as represented or that the returns therefrom were not as represented, but who continue to retain the property upon the sellers' representations that more time is necessary in the testing, representations that adjustment or correction will be made, etc. Where such suggestions and representations are made by a seller and induce and occasion delay by the purchaser in rescinding, these are matters proper to be taken into consideration in determining whether rescission is foreclosed against the purchaser as a matter of law, or whether a fact issue is presented for a jury.

In the present instance, in view of the evidence generally, particularly since the defendants kept promising help or cooperation with the plaintiff up until a date in July, 1954, were delayed in replacing the used machines with the new ones contemplated by the contract, and since the type of business enterprise was one which in our view required at least several months of testing before it would be disclosed that profits to be derived therefrom would not amount to the average profit figure represented per machine, we are of the opinion that the matter of foreclosure from the remedy of rescission depended upon jury findings and was not resolved as a matter of law. Super-Cold Southwest Co. v. Willis, Tex.Civ.App., Dallas, 1949, 219 S.W.2d 144, writ ref., n. r. e. The fact that plaintiff made payments on the unpaid balance (evidenced by note) under such circumstances was reasonable and not as a matter of law necessarily inconsistent with his claim of rescission. Way v. Siddall, Tex.Civ.App., Fort Worth, 1927, 299 S.W. 313, error refused; Prescott-Phoenix Oil & Gas Co. v.

Gilliland Oil Co., Tex.Civ.App., Amarillo, 1922, 241 S.W. 775; Culver v. Haggard, Tex.Com.App.1925, 270 S.W. 846.

The defendants having refused the plaintiff's tender left plaintiff in the identical position as regards the business and its physical properties as theretofore, save and except that he held the same, and the proceeds therefrom, as the involuntary bailee/trustee. This was true because plaintiff's collection from the coin boxes was not a possessory use analogous to that of the purchaser of an automobile who makes a tender in rescission and having the tender refused continues to use the same for his personal benefit. Here, the action of the plaintiff was not inconsistent with his claim of rescission. The locations where the individual machines were on the date of the tender had a value in themselves to the business enterprise, and had the plaintiff removed the machines he would have handicapped the ability of the very court from which he was seeking relief to restore the status quo of the parties upon plaintiff's establishment of his right to rescind. If the contract was one proper for rescission, then the defendants were entitled to have the machines "on location" in operation and accumulating profits. Stated in another way, it was the plaintiff's duty to use all reasonable care to make the defendants' loss (in the event of a judgment of rescission) as light as possible. To that end he must not wilfully allow the property to deteriorate or be destroyed, although he has a right to do any act in regard thereto reasonably necessary to protect his own interest, while at the same time maintaining his claim to rescind. 37 Tex.Jur., "Sales", p. 537, sec. 244, "Buyer's Duty if Tender is Rejected"; Black on Rescission and Cancellation, Vol. 2, p. 1439, sec. 623; Nu-Enamel Paint Co. v. Davis, Tex.Civ.App., Fort Worth, 1933, 63 S.W.2d 861, writ dism.; Temple Nat. Bank v. Warner, Tex.Civ.App.1898, 44 S.W. 1025, reversed on other grounds in 92 Tex. 226, 47 S.W. 515; Hickman v. Cooper, Tex.

Civ.App., Eastland, 1948, 210 S.W.2d 858, writ ref., n. r. e.

■ The defendants predicate a point of error upon the proposition that the jury finding to the effect that the plaintiff *discovered the falsity of one or more of the representations made to him by or in behalf of the defendants prior to the time he made the June and July payments*—conflicted with jury findings that plaintiff never at any time intended to waive rescission and did not wait for an unreasonable length of time before making tender. It should be clear from what has been said that in this instance no affirmative defense was established by the first mentioned jury finding. If we are correct in such opinion then it could not be said that there is a conflict existent which would be fatal to the judgment entered. A party seeking to set aside a verdict on ground of a conflict in answers to special issues must be able to point out that one of the conflicting answers, in connection with the rest of the verdict except the issue with which it conflicts, necessarily requires the entry of a judgment different from that which the court entered. *Little Rock Furniture Mfg. Co. v. Dunn*, 1949, 148 Tex. 197, 222 S.W.2d 985, and cases following.

■ At the close of plaintiff's opening case there was no doubt but what a prima facie case for rescission had been made out. It was defendants' belief that a conclusive case was also made out for their affirmative defenses of waiver and estoppel. Defendants did not rest their own case, but filed a motion for an instructed verdict, based upon their contention that the evidence established their defenses as a matter of law. The court overruled the motion. Then the plaintiff requested permission of the court to reopen his case and supplement the testimony already in the record bearing upon the matter of time of discovery of fraud, etc. Leave was granted over the objection of defendants. Plaintiff took the stand and testified more extensivly upon

the matter of the discovery of fraud, actions subsequent thereto, etc. Defendants have predicated a point on appeal complaining that the trial court abused its discretion in permitting plaintiff to so testify. They believe that in view of the state of the record at time plaintiff first announced that he rested they were surely entitled to an instructed verdict, even though the decision on waiver and estoppel should go against them with the supplementary evidence considered.

Texas Rules of Civil Procedure, rule 270, vests discretion in trial courts to permit additional evidence at any time prior to the return of a verdict by a jury whenever such clearly appears to be necessary to the due administration of justice. If the evidence is upon a noncontroversial matter it may be received even after verdict. The rule in all respects here material was derived from Vernon's Annotated Civil Statutes, Art. 2181. We perceive no abuse of discretion on the part of the trial court in permitting the additional evidence at the time that it did. The point is overruled.

The judgment is affirmed.