NO. 07-01-0344-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

OCTOBER 2, 2002

_____

MEYER FARMS, INC. AND MEYER OIL COMPANY, INC.,

Appellants

v.

TEXACO PRODUCING, INC.,

Appellee

_____

FROM THE 100TH DISTRICT COURT OF CARSON COUNTY;

NO. 7067; HON. DAVID M. MCCOY, PRESIDING

_____

Before QUINN, REAVIS and JOHNSON, JJ.,

Meyer Farms, Inc. and Meyer Oil Company, Inc. (collectively referred to as Meyer)

appeal from a take-nothing judgment entered in response to a summary judgment motion

filed by Texaco Producing, Inc. (Texaco).[1] The latter had filed a traditional and no-

---

[1]Meyer Farms and Meyer Oil were the only plaintiffs mentioned in the summary judgment. Yet, the record illustrates that a third entity, Meyer Land & Cattle Company, Inc. joined the litigation as a party plaintiff via the "Plaintiffs' Fourth Amended Original Petition." And, though it was a party plaintiff, it went unmentioned in the summary judgment. Thus, a question arose as to whether the summary judgment was final for purposes of appeal. We conclude that it was given the parties' written stipulation of July 20, 2001, the same day summary judgment was executed. Through that stipulation, all agreed that the "Current Action" consisted "of the claims set forth in the Third Amended Petition." Meyer Land & Cattle Company was not named as a plaintiff in that petition. Thus, logic compels us to hold that the claims of Meyer Land & Cattle were not part of the suit in which the "Final Summary Judgment" was entered.

evidence motion for summary judgment. Via two issues, Meyer complains that the trial court erred in granting 1) the summary judgment and 2) Texaco's Special Exception No. 6 to Meyer's pleadings. We affirm.

## Background

In 1988, Meyer filed a breach of contract action against Texaco asserting that Texaco failed to pay Meyer amounts due for gas sales under three contracts. The contracts in question were dated July 1, 1981, February 17, 1983, and October 6, 1973 (Original Contracts). Under these contracts, Texaco's predecessors in interest (Getty and Skelly) were to purchase from Meyer gas produced from certain wells under a price structure set out in the contracts. However, on October 9, 1984, Getty sent two letters to Meyer concerning these three contracts. In the letters, Getty stated, "[c]onditions have existed for some time now concerning the sale of NGL's and residue gas . . . which renders [sic] the purchase of gas under the terms of the referenced agreement unprofitable to Getty; therefore . . . Getty has no other option other [sic] than to propose an alternate pricing structure . . . or discontinue the purchase of gas from the subject lease." On November 9, 1984, Meyer signed two letter agreements modifying the pricing structure under the contracts. Meyer performed under the new pricing structure for four years without protest or complaint.

Meyer filed this lawsuit on June 23, 1988. In the petition, he contended that Texaco failed to pay Meyer the purchase price of the gas as structured under the original agreements. Furthermore, to avoid the effect of the 1984 modifications, it was asserted

2

(through the live pleadings) that those modifications 1) were secured via duress, bad faith, and fraud, and 2) were unconscionable.

Texaco received an initial summary judgment, which we reversed in *Meyer Farms, Inc. et al v. Texaco Producing, Inc.*, 07-98-0029-CV; 1999 Tex. App. WL125725 (Amarillo March 10, 1999, pet. denied). Upon remand, it again sought summary judgment. This time, Texaco contended that no evidence supported Meyer's allegations of 1) lack of consideration, 2) duress, 3) unconscionability, 4) bad faith, and 5) fraud.[2] So too did Texaco assert that it established, as a matter of law, that those allegations were barred by the defenses of ratification and estoppel. The trial court again granted the motion. In doing so, however, it did not specify the ground upon which it acted. It merely denied recovery to Meyer.

### Standard of Review

The standards of review governing appeals from summary judgments are well-settled. Rather than reiterate them, we refer the litigants to *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548 (Tex. 1985) and *Kimber v. Sideris*, 8 S.W.3d 672, 675 (Tex. App.–Amarillo 1999, no pet.) for an explanation of them. Next, because the trial court did not specify the ground upon which it acted, the appellant, Meyer, had the burden to illustrate that none of the grounds alleged in the motion supported judgment. *Carr v. Brasher,* 776 S.W.2d 567, 569 (Tex. 1989).

### Application of Standard

---

[2]The allegations *viz* lack of consideration are moot. Meyer omitted from its live pleading that theory as a basis for avoiding the modifications.

3

*Ratification*

We begin our review by addressing the ground of ratification. The latter occurs when one, induced into executing an agreement via misconduct, continues to receive the benefits of the contract after becoming aware of the misconduct or otherwise acts in a way recognizing the contract as subsisting and binding. *Rosenbaum v. Texas Bldg & Mort. Co.*, 140 Tex. 325, 167 S.W.2d 506, 508 (1943); *Pitman v. Lightfoot*, 937 S.W.2d 496, 522 (Tex. App.—San Antonio 1996, writ denied). The ratification need not be expressed. *Id.* "[A]ny act based upon a recognition of the contract as existing or any conduct inconsistent with an intention of avoiding it has the [requisite] effect . . . ." *Rosenbaum v. Texas Bldg & Mort. Co.*, 167 S.W.2d at 508. And, though the intent of the person allegedly ratifying the misconduct is important, *Old Republic Ins. Co. v. Fuller*, 919 S.W.2d 726, 728 n.1 (Tex. App.—Texarkana 1996, writ denied), *The Atrium v. Kenwin Shops of Crockett, Inc.*, 666 S.W.2d 315, 318 (Tex. App.-—Houston [14th Dist.] 1984, writ ref'd n.r.e.), the intent involved is the voluntary, intentional performance of an act inconsistent with an intention of avoiding the prior agreement. *Old Republic Ins. Co. v. Fuller*, 919 S.W.2d at 728 n.1. In other words, the party need only perform an act inconsistent with the supposed desire to nullify the accord while intending to voluntarily perform the act. Given this, the critical factors in assessing whether ratification occurred are 1) knowledge of the purported wrong and 2) action in light of that knowledge. *Land Title Co. of Dallas, Inc. v. F. M. Stigler, Inc.*, 609 S.W.2d 754, 756-57 (Tex. 1980). As stated by the Texas Supreme Court in *Stigler*, "[w]hat must be considered is [the plaintiff's] actions once it acquired knowledge of [the defendant's] act." *Id.* And, the requisite action can be nothing more than inaction or

4

silence.  *Pitman v. Lightfoot*, 919 S.W.2d at 523, *quoting BancTEXAS Allen Parkway v. Allied American Bank*, 694 S.W.2d 179, 182 (Tex. App.-—Houston [14th Dist.] 1985, no writ).  So, "[w]hen the benefits [in question] are the direct, certain, and proximate result of [the improper] act, retention of those benefits after the [plaintiff] acquires knowledge of the [act] constitutes affirmance of the act and ratification to the transaction."  *Land Title Co. of Dallas, Inc. v. F.M. Stigler, Inc.,* 609 S.W.2d at 757.  And, this determination can be made as a matter of law if the evidence is uncontroverted or incontrovertible.  *Pitman v. Lightfoot*, 937 S.W.2d at 522-23; *Old Republic Ins. Co. v. Fuller*, 919 S.W.2d at 728; *Sawyer v. Price*, 580 S.W.2d 117, 123 (Tex. Civ. App.—Corpus Christi 1979, writ ref'd n.r.e.).

It is uncontroverted that from the time Texaco approached Meyer regarding the 1984 modifications, Meyer disagreed with Texaco's interpretation of the original contract and its claim that it also had the authority to cancel the original agreement on the basis of unprofitability.  Similarly uncontroverted are the facts that Meyer 1) nevertheless agreed to the proposed modifications of Texaco, 2) sold product to and received payment from Texaco in accordance with those modifications from November 9, 1984, to December of 1989, and 3) said nothing about his disagreement with Texaco's interpretation of the original contract and supposed right to modify until he filed the pending suit on June 23, 1988.  These facts illustrate 1) knowledge by Meyer of Texaco's purported misconduct as early as 1984, 2) acquiescence to the modifications despite that knowledge, 3) the sale of product to Texaco in accordance with the modifications for over five years, 4) the acceptance of five years worth of payments by Meyer from Texaco in accordance with the 1984 modifications, and 5) the continued acceptance of at least one year's worth of

5

payments under the modifications after suit was filed. This is nothing short of conduct 1) intentionally undertaken long after discovery of the grounds purportedly justifying termination of the 1984 accord and 2) inconsistent with the intent to rescind that agreement. In short and concerning Meyer's allegations regarding the interpretation of the Original Contracts and purported rights under them, Texaco established the defense of ratification as a matter of law and its right to summary judgment, unless Meyer somehow raised a material issue of fact prohibiting entry of judgment.

Meyer attempted to raise such an issue of fact by asserting duress. That is, he argued that he agreed to the 1984 changes because he had no other market for his product and had to accede to Texaco's demands. Furthermore, he purportedly had no alternative market because various lawsuits were pending which questioned title to the product from the leases encompassed in the Original Contracts. And, since title to the product was in question, no one other than Texaco would buy it, he theorized. If these circumstances are accepted as true, then a material issue of fact may have existed regarding the voluntariness of his actions regarding performance of the 1984 amendments and the receipt of benefits under them; again, *Pitman* states that the acts undertaken upon garnering knowledge of the misconduct must be voluntarily performed. Yet, the record before us incontrovertibly illustrates that the suits which placed title to his minerals in question and allegedly inhibited Meyer from selling them elsewhere were settled by July 31, 1987. So, from July 31, 1987, through December of 1989, or for approximately two and one-half years after the basis for his claim of duress was no longer in existence, he continued to perform under and receive benefit from the 1984 modifications. Given this,

6

we cannot say his actions from July 31, 1987, through December of 1989, constituted any evidence upon which a rational juror could hold that his performance of the modifications and receipt of its benefits were involuntary due to duress.[3]

Nor do we hold that Meyer's utterance, in his affidavit, that he never approved, adopted or confirmed, nor intended to approve, adopt or confirm the modification somehow precludes summary judgment on the claim of ratification. First, the utterances are conclusory statements and, therefore incompetent summary judgment evidence. *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984) ) (holding that conclusory statements are not competent summary judgment evidence), *Dickerson v. Davis*, 925 S.W.2d 123, 126 (Tex. App.—Amarillo 1996, writ dism'd w.o.j.) (holding the same). Second, they do not indicate that he did not intend to voluntarily perform acts inconsistent with his purported desire to rescind the 1984 modifications while having knowledge of the alleged misconduct and once the purported circumstances causing duress ended. That is the relevant intent, according to *Old Republic*. *Old Republic Ins. Co. v. Fuller*, 919 S.W.2d at 728 n.1. And, the intentional acts evincing such inconsistency were Meyer's performance of the 1984 modifications and his acceptance of benefits granted under that agreement once the circumstances allegedly causing him duress ended.

---

[3]Meyer did attest in an affidavit that once the lawsuits were "terminated or resolved, it took several months to finalize the proceedings so that [he] could begin to even attempt to sell gas to other parties." This statement is of no consequence, however. While it may have taken "several months" to finalize the proceedings, it does not explain what prevented him from finding alternate buyers during the two years after those "several months" expired. Furthermore, to the extent that he suggests the initiation of the suit illustrates an act consistent with termination of the changes, that suit was not initiated until 11 months after the circumstances allegedly causing him duress ended. And, he does not explain why he said nothing to Texaco during that interim, or why he simply kept performing under the 1984 changes.

Nor do we find Meyer's reliance on *Arroyo Shrimp Farm, Inc. v. Hung Shrimp Farm, Inc.*, 927 S.W.2d 146 (Tex. App.—Corpus Christi 1996, no writ ) persuasive. Though the court there stated that "[a]cts done in affirmance of the original contract do not necessarily amount to a waiver of the right to sue for fraud," *id.* at 154, the context in which the statement was made differs from the one at bar. There, evidence appeared of record indicating that the plaintiff did not know of the fraud until shortly before filing suit. *Id.* at 154. Here, there is no doubt that as of the date on which the 1984 changes were proposed to him, Meyer disagreed with Texaco's construction of the original contract. At that time he also disputed Texaco's authority to terminate the agreement or propose modifications in lieu of termination. Despite this, he nevertheless acceded to the changes and performed under them for approximately five years. Again, during the first four years of that period, Meyer performed without complaint to Texaco. And, by the inception of the fourth year, the conditions which allegedly forced him to agree to the changes had ended. So, unlike that in *Arroyo Shrimp*, we do not have before us a situation wherein suit was filed soon after discovery of the misconduct warranting rescission of the tainted agreement.

Nor is Meyer's citation to *Potter v. Reinhart*, 337 S.W.2d 174 (Tex. Civ. App.—Waco 1960, no writ) consequential. *Potter* may be read as stating that the initial receipt of a lesser sum than the total due does not necessarily prevent the creditor from recovering the remainder. *Id.* at 178. But, like *Arroyo Shrimp*, the circumstances in *Potter* differ from those before us. The litigants in *Potter* did not sign an agreement modifying the obligations of the parties. Here, they did. Nor did all the parties there perform under an

8

agreement modifying the original contract for many years. Here, they did. And, most importantly, Meyer so performed after the circumstances allegedly forcing him to execute the modifications ended.

In sum, Texaco established the elements of ratification as a matter of law with regard to Meyer's allegations about Texaco's misinterpretation of the Original Contract and its purported contractual right to terminate or change the agreement. Yet, concerning the allegations purportedly involving misrepresentations as to the profitability and options available to Texaco other than the termination or the modification of the agreement, the same cannot be said. This is so because Meyer asserts that he did not discover those wrongs until after he filed suit and began conducting discovery. And, upon discovering them, he amended his pleadings to incorporate them into pertinent causes of action. Given the rule that ratification of a particular misconduct known to one does not constitute ratification of unknown misconduct which may also be distinct grounds for a cause of action, *Deaton v. Rush*, 113 Tex. 176, 252 S.W. 1025, 1030 (1923), *Vandervoort v. Sansom*, 293 S.W.2d 271, 272-73 (Tex. Civ. App.—Fort Worth 1956, writ ref'd n.r.e.), we cannot hold that the defense of ratification barred all of Meyer's claims as a matter of law. This, consequently, requires us to consider several other grounds uttered by Texaco as a basis for summary judgment.

*Fraud*

We next address the matter of fraud. Meyer claimed that various representations contained in correspondence accompanying the proposal to modify the Original Contracts were fraudulent. These representations were purportedly material and made with the

9

intent that they be relied upon by Meyer. The latter also pled that he relied on them in executing the agreements. In its motion for summary judgment, Texaco contended that Meyer had no evidence creating a material issue of fact regarding any elements of fraud, including reliance.

That reliance is an element of fraud is beyond dispute. *Haase v. Glazner*, 62 S.W.3d 798 (Tex. 2001). Thus, because Texaco asserted in its motion for summary judgment that there existed no evidence creating a material issue of fact regarding any element of fraud (including reliance), Meyer had the burden to present evidence creating the requisite fact issue. *Kimber v. Sideris,* 8 S.W.3d at 675 (discussing the burden of proof on the non-movant when the movant seeks a no-evidence summary judgment). Here, Meyer posits that he satisfied his burden by stating, via his affidavit, that he 1) "signed the modifications as a result of and [in] reliance upon . . . [the] fraudulent and bad faith actions" of Getty, Texaco's predecessor.[4]

As previously mentioned, statements in affidavits must be more than mere conclusions. *Brownlee v. Brownlee*, 665 S.W.2d at 112; *Dickerson v. Davis*, 925 S.W.2d at 126. Meyer's attestation that he signed the modifications in "reliance" upon the alleged fraud is accompanied by no factual development. He simply says he relied upon the misrepresentations. Furthermore, the factual allegations (as opposed to conclusions) which do address why he acceded to the changes illustrate that he did so because he did

---

[4]Meyer also cited, as evidence of reliance, to the statement in an affidavit that "Meyer Farms, Inc. and Meyer Oil Company, Inc. executed the amendments relied upon by Texaco under the wrongful threat of termination . . . ." Upon finding the quoted passage in the record and reading it in context, however, we discovered that the word "reliance" did not refer to reliance on the part of Meyer's companies but to reliance on the part of Texaco regarding some unmentioned topic. Thus, the passage is not evidence of reliance by Meyer or his companies.

10

not have other markets in which to sell his product. And, it must be remembered that he lacked those alternate markets not because of any misrepresentations by Texaco but because of the claims in various suits involving third parties. So, because the utterance about reliance lacked factual development, it was and is a mere, non-probative conclusion. Being such, it was and is not competent evidence sufficient to create a material issue of fact upon the element of reliance and, thereby, stave off summary judgment. Therefore, the trial court did not err in granting summary judgment against Meyer upon his claim of fraud.

*Bad Faith*

As described in his live pleading, Meyer also sought to vitiate the 1984 modifications on the basis of bad faith per the Texas Business and Commerce Code. That is, he alleged that Texaco acted in bad faith when securing the changes. Furthermore, the bad faith allegedly consisted of misinterpreting those provisions in the Original Contracts which permitted Texaco to end the agreement. In uttering misrepresentations about the profitability of the Schafer gas processing facility and its lack of options, Texaco also acted improperly, Meyer contended. Texaco responded, via its motion for summary judgment, by asserting that there existed no evidence to support the contention and that it acted in good faith and so alleged in its motion for summary judgment.

Several years ago, this court held that merchants attempting to modify contracts involving the sale of goods must act in good faith. *El Paso Nat. Gas Co. v. Minco Oil & Gas Co.*, 964 S.W.2d 54, 66-67 (Tex. App.—Amarillo 1997) *rev'd in part on other grounds* 8 S.W.3d 309 (Tex. 1999). Good faith involves honesty in fact and the observance of

11

reasonable commercial standards of fair dealing in the trade. *Id.* at 67. So too did we hold that the buying and selling of gas constitutes a transaction in goods. *Id.* at 67. Furthermore, whether one acts in a manner less than honesty in fact or per reasonable commercial standards may be established in various ways. Examples include economic extortion or overreaching and deception. *Id.* at 67-68.

Each of the instances of bad faith cited by Meyer emanate from the October 9, 1984 letter he received from Texaco's predecessor in interest, Getty.[5] Among other things, Getty said in that letter that:

> Paragraph V, Sub-paragraph B, of said [July 1, 1981 Casinghead Gas Contract] states that in the event the purchase of gas from any well covered hereunder, in the sole judgment of the Buyer, is or becomes unprofitable due to its volume, heating value or any other condition, Buyer reserves the right to discontinue taking gas from the particular well or wells for as long as such conditions exist and may terminate this contract upon thirty (30) days' written notice to Seller.
>
> As you are aware, the gas attributable to the [Meyer] lease is processed at [the] Schafer area facility . . . . Conditions have existed for some time now concerning the sale of the NGL's and residue gas from the said facility which renders the purchase of gas under the terms of the referenced agreement unprofitable to Getty ; therefore, in accordance with the above mentioned provision Getty has no other option other than to propose an alternate pricing structure as detailed in the attached letter agreement, or discontinue the purchase of gas from the subject lease.

Regarding Meyer's contention that Texaco acted in bad faith because it misconstrued, *via* the foregoing letter, its right to terminate the gas contract and considered unprofitability as a condition of the gas, we need not address those grounds.

---

[5]Of note is that Getty was preparing to merge with Texaco when this letter was written.

This is so because they fall within the realm of purported misconduct which was ratified, as discussed above.

As to the contention that Texaco misrepresented that its purchase of the gas was no longer profitable, we note evidence indicating error in the study upon which the representation was based. So too do we note evidence indicating that the general operation of the Schafer processing facility was indeed profitable. Yet, none of that evidence is of consequence. While it may be that Texaco's study was considered inaccurate by one or more of its employees and based upon sales over a very limited period, Meyer cites us to no evidence indicating that the purchase of his gas was indeed profitable. Instead, he refers us to evidence indicating that Texaco made a profit from the operation of the Schafer facility as a whole. However, that is not evidence of profitability *viz* the purchase and subsequent sale of gas specifically obtained from Meyer. This is so because gas from other sources was also being run through the unit.[6] Thus, one cannot reasonably deduce that the purchase and sale of gas from Meyer was profitable from evidence indicating that the operation of the Schafer facility was profitable. And, most importantly, in commenting upon unprofitability in the October 9th letter, Texaco was alluding to the acquisition and sale of Meyer's gas, not to the overall operation of the Schafer facility.

---

[6]More gas than that acquired from Meyer was being processed at the Schafer facility, according to the record. And, it was the gas other than Meyer's which allowed Texaco to make a profit. Indeed, the evidence before us indicates that the processing and sale of Meyer's gas was unprofitable, given the terms of the Original Contracts.

13

As to the matter of having options, Meyer is correct in that Texaco always had the option to perform as per the terms of the 1981 casinghead contract. Yet, that is the very same option Texaco had when it allegedly decided to misinterpret its right to terminate per the Original Contracts. And, because Meyer disagreed with Texaco's interpretation of those contracts from the beginning, he must have disagreed (at that time) with the notion that Texaco had no option but to terminate the contract. Thus, that particular ground of bad faith fell within the scope of purported misconduct which he ratified, as previously discussed.

In short, we find no evidence creating a material issue of fact regarding Texaco's bad faith. Consequently, the trial court did not err in granting summary judgment on that allegation.

Our decision upon the foregoing issues is dispositive of the appeal. We need not consider any other points asserted by Meyer before us. Accordingly, the summary judgment executed below is affirmed.


Brian Quinn
Justice

Do not publish.

14